Estate of Sol Goldenberg, Deceased, Union Bank, Executor, and Anna Goldenberg, et al. [1] v. Commissioner. Estate of Goldenberg v. Commissioner
Docket Nos. 78723-78726.
United States Tax Court
T.C. Memo 1964-134; 1964 Tax Ct. Memo LEXIS 201; 23 T.C.M. (CCH) 810; T.C.M. (RIA) 64134; May 14, 1964
*201 The Goldenbergs transferred the stock of a corporation, the assets of a related partnership, and certain business real estate to the Foundation, a charitable organization. The Foundation liquidated the corporation and leased certain assets of the business (the real estate, the machinery and equipment of the corporation, and certain intangibles) for a term of 5 years to Products, a corporation formed to operate the business, in which two of the Goldenbergs held a large minority interest. Products was to pay 80 percent of its profits as "rent" to the Foundation, which was then to pass on 90 percent of those receipts to the Goldenbergs until the original purchase price was paid in full. After the expiration of the lease to Products, the Foundation leased substantially the same assets on similar terms successively to Camelback and Tread, new operating companies. Held: (1) Under the doctrine of collateral estoppel, a decision of the Court of Claims in a prior proceeding involving installment payments received by the Goldenbergs in 1954 pursuant to their agreement with the Foundation conclusively establishes that they are entitled to capital gain treatment on the payments received by them *202 in 1955 and 1956 pursuant to the same agreement. (2) "Rental" paid by Products disallowed in part because it was not paid for the use of the leased property. Fair rental value determined. (3) Products was not engaged in a joint venture with the Foundation. George T. Altman, 233 S. Beverly Drive, Beverly Hills, Calif., for the petitioners in Docket Nos. 78723 and 78726. Stanley C. Anderson and Seth M. Hufstedler for the petitioners in Docket Nos. 78724 and 78725. Karl M. Samuelian for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioners' income and excess profits taxes for the years and in the amounts as follows: Year
Tax
Deficiency
Estate of Sol Goldenberg, Deceased, Union Bank, Executor, and
1955
Income
$ 37,112.96
Anna Goldenberg, Docket No. 78723
1956
Income
118,789.18
Jerome Goldenberg and Helena Goldenberg, Docket No. 78724
1955
Income
1,098.64
1956
Income
3,596.61
Ida Goldenberg, Docket No. 78725
1955
Income
34,454.36
1956
Income
123,661.28
FY ended
Tax
Deficiency
Golden West Rubber Products, Inc., Docket No. 78726
10-31-52
Income & Excess Profits
$226,274.02
10-31-53
Income & Excess Profits
133,272.92
10-31-54
Income & Excess Profits
82,079.64
10-31-55
Income
108,055.31
10-31-56
Income
121,097.49
*203 The substantive issue presented in Docket Nos. 78723, 78724 and 78725 is whether certain payments received by the individual petitioners in 1955 and 1956 pursuant to an agreement with Loyola University Foundation represent proceeds from the sale of capital assets. Preliminary to the consideration of this issue is the question of whether a prior adjudication by the United States Court of Claims, involving payments received by the petitioners in 1954 pursuant to the same agreement, is conclusive of the issue here under the doctrine of collateral estoppel. Certain minor issues in Docket No. 78725, relating to an additional personal exemption and deductions for medical expenses, have been settled by stipulation. Certain other issues were raised by the petitioners filed in Docket Nos. 78723 and 78725, but no evidence was presented on these issues at the trial, nor were they argued on brief, and bence they are deemed to have been abandoned. The issue presented in Docket No. 78726 is whether certain amounts paid by the corporate petitioner in the form of rent to the came Foundation are deductible as rental copenie Alternatively, petitioner contends that the amounts claimed as rental expense *204 should be shifted from its income to that of the Foundation on the theory that the Foundation was a joint venturer with it sharing the profits of the business. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Sol. Goldenberg (hereinafter sometimes referred to as "Sol") and Anna Goldenberg were husband and wife, and resided during the taxable years in Beverly Hills, California. They filed joint Federal income tax returns for the years 1955 and 1956. Sol died on January 8, 1960, and Union Bank is the duly appointed executor of his estate. [2]
Petitioners Jerome Goldenberg (hereinafter sometimes referred to as "Jerome") and Helena Goldenberg, husband and wife, resided during the taxable years in Los Angeles, California. They filed joint Federal income tax returns for the years 1955 and 1956. Petitioner Ida Goldenberg (hereinafter sometimes referred to as "Ida") *205 resided during the taxable years in Los Angeles, California. She filed individual Federal income tax returns for the years 1955 and 1956. Petitioner Golden West Rubber Products, Inc., was incorporated in California on November 1, 1951, and dissolved in 1957. It filed Federal income tax returns prepared on an accrual basis for its fiscal years ended October 31, 1952 through 1956. The returns filed by all of the petitioners for the respective taxable years were filed with the district director of internal revenue at Los Angeles, California. Sol and Jerome were brothers, and Ida is their mother. Sol, Jerome and Ida will hereinafter sometimes be referred to collectively as "the Goldenbergs." On June 25, 1946, Golden West Rubber Co. (later known as Golden West Rubber Manufacturers, Inc., and hereinafter sometimes referred to as "Golden West") was incorporated in California to take over the operation of a business previously owned by Sol and Ida as equal partners. Sol and Ida each owned 50 percent of the outstanding stock of Golden West. Golden West was engaged in the manufacture and sale of tread rubber for the retreading of tires and materials for the repair of tires. It also distributed *206 to dealers a popular brand of new tires and tubes, the Diamond brand, manufactured by B. F. Goodrich Company. The business was conducted at 8228 South Central Avenue, Los Angeles, California (hereinafter sometimes referred to as "the Central Avenue property"). This property was owned by Ida individually, having been inherited from her husband, who died in 1941. The property consisted of five small buildings, built between 1934 and 1946, on a lot approximately 124 feet by 100 feet in size. Golden West paid Ida $12,000 per year as rent on the Central Avenue property. Sol was the general manager of the business, both before and after the incorporation. His ability and hard work contributed greatly to the success of the business. As president of Golden West, Sol received a salary of $20,800 per year. Jerome began working for Golden West in 1948 or 1949, shortly after finishing high school. His first job with the corporation was unloading trucks, and later he became shipping clerk. As he became more familiar with the business his responsibilities were increased. On October 26, 1950, Sol, Ida and Jerome formed a partnership under the name Golden West Tire & Rubber Co. (hereinafter sometimes *207 referred to as "the Partnership") to take over the sales functions of the business conducted by Golden West. The capital of the Partnership consisted of $80,000, of which $40,000 was paid in by Sol, $32,000 by Ida, and $8,000 by Jerome. The profits and losses were shared in proportion to the capital contributions. The Partnership and the corporation, Golden West, entered into an agreement by which the Partnership agreed to buy all of the items manufactured by Golden West. The business conducted by Golden West and the Partnership will hereinafter sometimes be referred to collectively as the "Golden West business." The manufacturing of tread rubber is a highly competitive business. In 1951, there were between 15 and 20 manufacturers selling in the Los Angeles area, including the large companies such as Goodyear. The tread rubber manufactured by Golden West was used by small companies engaged in the business of recapping tires. Sales were made, in the main, directly to these users although the Golden West business did have a few distributors. The personal contact between the salesman and the customers, rather than advertising, was the important element in producing sales. The advertising *208 was limited to trade journals, classified telephone directories and the like. Golden West did not have any patents, but it developed certain secret processes which were useful in the business. On August 24, 1951, Golden West purchased from Radio Corporation of America certain used equipment at a price of $76,590. Included in the equipment purchased was a Banbury mixer, a large and heavy piece of machinery. With the use of the mixer, Golden West could mix its materials at a lower cost than previously. As of October 31, 1951, the mixer and other equipment acquired from RCA had not been put into service. The sales of Golden West, and its net income before and after Federal income taxes, from its formation to October 31, 1951, were as follows: Net
Year
Net income
income
or Period
Sales
before tax
after tax
7-1 to
12-31-46
$ 709,076.18
$102,564.13
$ 63,589.76
1947
730,196.57
27,005.22
20,192.45
1948
789,183.51
20,151.07
15,613.31
1949
1,032,223.18
42,589.36
27,517.00
1950
2,260,245.65 *
395,412.53
191,828.72
1-1 to
10-31-51
1,130,656.43 #
83,886.82
44,384.46 The sales and net income of the Partnership from its formation *209 to October 31, 1951, were as follows: Period
Sales
Net Income
10-26 to 12-31-50
$ 551,163.90
$126,232.14
1- 1 to 10-31-51
2,124,140.46
394,830.93
Loyola University Foundation (later known as University Hill Foundation and hereinafter sometimes referred to as "the Foundation") was a California corporation which, on November 19, 1946, was held to be exempt from Federal income taxes as an educational and charitable organization. On April 4, 1956, the exemption of the Foundation was revoked for its fiscal year ended April 30, 1952, and for subsequent fiscal years. Sometime prior to November 1, 1951, Sol and representatives of the Foundation entered into discussions concerning the possible acquisition of the Golden West business by the Foundation. These discussions led to the execution of a purchase agreement dated November 1, 1951, between the Foundation, as buyer, and Sol and Ida (individually) and the Partnership, through its three partners (Sol, Ida and Jerome), as sellers. The purchase agreement provided that, as of November 1, 1951, the sellers sold to the Foundation all the outstanding stock of Golden West, all the assets of the Partnership, and the Central Avenue property. The purchase price *210 was to be $2,000,000, plus an amount equal to the net book value of Golden West and the Partnership, and $50,000 for the Central Avenue property. The Foundation was to make a down payment of $100,000 in cash, and the balance of the purchase price was to be payable in the following manner: 1. The Foundation was to liquidate Golden West immediately and receive its assets in liquidation. It was then to execute a lease to an operating company of its selection, leasing to such operating company the Central Avenue property and the "name, good will, secret processes and formulae," and fixed assets received from the liquidation of Golden West and from the Partnership. 2. The Foundation was to transfer to the operating company the other assets of Golden West and the Partnership, except cash in the amount of $150,000. In exchange, the operating company was to asrome all obligations and liabilities shown by the closing audit of Golden West and the Partnership, and to give the Foundation a two-year noninterest-bearing note for the amount by which the book value of the assets transferred to the operating company exceeded the total obligations and liabilities assumed by it. Such note was to be assigned *211 to the sellers as security for payment of the purchase price by the Foundation. The $150,000 not transferred to the operating company was to be used by the Foundation to acquire additional real property to be leased to the operating company. 3. The Foundation was obligated to make payment of the balance of the purchase price (after the $100,000 down payment) only out of the rent received from the operating company, which was to be based upon the operating company's net profits before taxes. It was agreed that the Foundation would pay to the sellers, to apply on the purchase price, 90 percent of the rents so received (except for the first $95,000 received) until the purchase price was paid in full. 4. The entire balance of the purchase price was due and payable on October 31, 1961. The unpaid balance was to bear no interest prior to the due date, but interest at the rate of 4 percent per annum thereafter. 5. As security for the payment of the purchase price, in addition to assigning the note of the operating company to the sellers, the Foundation was to execute and deliver to the sellers a deed of trust on the real property and a chattel mortgage on the personal property acquired by *212 the Foundation in the transaction. The Foundation also agreed to execute similar deeds of trust or chattel mortgages upon any afteracquired real or personal property. 6. If the Foundation should default on any of its obligations, the sellers were given the right to declare the entire purchase price immediately due and payable. However, their right to enforce payment of the amount so due was limited to the collateral given as security. It was provided in the purchase agreement that for a period of 3 years from November 1, 1951, or until the agreement was declared to be in default, Sol would not enter into any business venture which would compete with the business then being conducted by the operating company. Attached to the purchase agreement was a combined balance sheet of Golden West and the Partnership as of October 31, 1951, as follows: GOLDEN WEST TIRE AND RUBBER COMPANY GOLDEN WEST RUBBER MANUFACTURERS, INC. Combined Statement of Assets and Liabilities As Per Schedule "B" - Purchase Agreement As At October 31, 1951 ASSETS
CURRENT ASSETS: Cash in Union Bank and Trust Co.
$286,647.13
Petty Cash Fund
50.00
Accounts Receivable
260,887.32
Trade Acceptances Receivable
7,232.12
Merchandise Inventory
169,900.70
Deposit on Future Purchases
10,000.00
Deposit - Sales Tax
375.00
Due from Employees
490.00
Total Current Assets
$735,582.27
FIXED ASSETS: Machinery and Equipment
$132,161.65
Less: Reserve for Depreciation
30,592.09
$101,569.56
Autos and Trucks
$ 12,451.78
Less: Reserve for Depreciation
2,794.37
9,657.41
Real Estate - 8228 Central Avenue
50,000.00 *
Total Fixed Assets
$161,226.97
OTHER ASSETS: Prepaid Insurance
1,889.13
Total Assets
$898,698.37
LIABILITIES
CURRENT LIABILITIES: Accounts Payable
$ 95,228.18
Accrued Taxes Payable - Payroll
3,325.98
Accrued Taxes Payable - Sales
185.16
Accrued Income Taxes Payable - Prior Period
43,693.68
Accrued Income Taxes Payable - Current Period
35,966.24
Total Liabilities
$178,399.24
CAPITAL
NET WORTH - October 31, 1951
$720,299.13
Total Liabilities and Capital
$898,698.37
*213 The fair market value of the tangible assets of the Golden West business, as of the date of the purchase agreement, was as follows: Central Avenue property: Land
$ 17,000.00
Buildings
18,000.00
Machinery and equipment
175,000.00
Automobiles and trucks
9,957.41
Current and other tangible assets,
less all liabilities
568,729.57
Total
$788,686.98
It was provided in the purchase agreement that all payments made by the Foundation to the sellers were to be made to Sol, acting in his own behalf and as trustee for Ida and Jerome. Sol, Ida and Jerome agreed among themselves that these payments were to be divided and distributed according to the following percentages: Sol, 49.08 percent; Ida, 47.07 percent; Jerome, 3.85 percent. The purchase price, computed as provided in the purchase agreement, totaled $2,720,299.13. In accordance with the purchase agreement, the stock of Golden West, the assets of the Partnership, and the Central Avenue property were transferred to the Foundation, and the cash payment of $100,000 was made by the Foundation to Sol, as trustee. The Partnership was dissolved as of November *214 1, 1951. Shortly after November 1, 1951, Golden West was formally dissolved and liquidated and all of its assets were distributed to the Foundation. On November 7, 1951, pursuant to the purchase agreement, a written lease was entered into between the Foundation and petitioner Golden West Rubber Products, Inc. (hereinafter sometimes referred to as "Products"), which was the new operating company. The leased property consisted of the Central Avenue property, the machinery and equipment acquired by the Foundation upon the liquidation of Golden West, and intangible assets described as: (c) The name and good will of "GOLDEN WEST" in connection with any business trade-name; and secret processes and formulae. An addendum to the lease provided that the real property to be purchased by the Foundation with the $150,000 held out from the liquidation of Golden West was to be added to the lease when acquired, with no increase in the rental. The lease was for a term of five years, beginning November 1, 1951, and ending October 31, 1956, with no option for renewal. The rent was to be an amount equal to 80 percent of the net profits of the business conducted with the leased property. Products was *215 to maintain the premises in a good state of repair. It could make capital improvements, with the cost thereof to be credited upon rent due the Foundation, to a maximum of $2,500 in any quarter year unless the Foundation consented in writing to a greater amount. Products was to pay all property taxes and to insure the leased property. In the event of damage, the insurance proceeds were to be used to restore the property. Products could not assign the lease or sublet the property without the written consent of the Foundation. At all times during the continuance of the lease, a majority of the outstanding stock of Products was to be held only by such persons as the Foundation approved in writing. Under date of November 7, 1951, the Foundation executed a bill of sale and assignment transferring to Products all of the tangible assets formerly owned by Golden West and the Partnership, except those assets which had been leased to Products, and except the $150,000 cash held out to acquire real estate. The assets so transferred included cash, accounts and trade acceptances receivable, inventory, a deposit on future purchases, automobiles and trucks and other items, and had a total book value *216 of $597,128.81. In return, Products assumed the liabilities of Golden West and the Partnership ($178,399.24) and executed a note to the Foundation for $418,729.57, payable on or before two years after date without interest before maturity but with interest at 7 percent per annum from and after maturity. In accordance with the purchase agreement, the Foundation, to secure the payment of the purchase price to the Goldenbergs, gave Sol, as trustee, a trust deed on the Central Avenue property and a chattel mortgage on the machinery and equipment acquired on liquidation of Golden West, and also assigned to him the $418,729.57 note of Products, without recourse. In addition to the subject transaction with the Goldenbergs, the Foundation entered into a number of similar transactions involving other successful business enterprises. The general pattern in these transactions was that the lease to the operating company provided for a rental of 80 percent of net profits, as did the lease to Products, and that this amount was reduced after the sellers of the business had been fully paid. Sol paid a "finder's fee" of $5,000 to one Dan Sokol, who had advised him about the Foundation. Sokol was connected *217 with a corporation which had previously entered into a transaction with the Foundation. In November 1951, pursuant to the provisions of the lease to Products, the Foundation approved Sol, Jerome, Jack Helfend and David Belinkoff as the holders of the majority of the stock of Products, but limited the holdings of Sol and Jerome to 48 percent of such stock. It had previously been agreed that the holdings of Sol and Jerome were to be so limited, that a maximum of 16 percent of the stock was to be issued to persons chosen by the Foundation, and that the remainder was to be issued as directed by Belinkoff. Belinkoff is a certified public accountant and the head of an accounting firm which had performed auditing and accounting services for Sol and Golden West for many years. He also engaged in other business transactions with Sol. The stock of Products was initially issued for cash as follows: Number
Amount
Issued in the name of
of shares
Paid
Sol Goldenberg
240
$ 2,400
Jerome Goldenberg
240
2,400
Jack Helfend
100
1,000
Francis L. Beiter
60
600
David Belinkoff
200
2,000
Mildred Spencer
160
1,600
Total
1,000
$10,000 Jack Helfend, who is the brother of petitioner Anna Goldenberg (Sol's wife), had been employed by *218 Golden West since 1945 and had served as assistant general manager of the business prior to the transaction with the Foundation. Francis L. Beiter had been plant manager for Golden West and assumed the same position for Products. Mildred Spencer was a nominee of the Foundation. Changes in the stockholdings subsequent to the original issuance were as follows: Belinkoff sold 60 of his shares to John C. Johnson, the sales manager of Products, and 40 shares to Gendel & Raskoff, attorneys for the corporation. He also sold 40 shares in 1951 to another employee of Products, but subsequently repurchased those shares. Beiter sold 40 of his shares to Products in 1953. In 1956, he left the employ of Products and sold his remaining 20 shares to the corporation, which thereupon resold 10 shares to Johnson and 10 shares to Helfend. Products took over the entire force of employees of Golden West and the Partnership, consisting of eight officers and department heads, five salesmen and 24 other employees. Johnson, who was employed as sales manager of Products shortly after its formation, had been sales manager of Golden West beginning about 1949, but had left the organization early in 1951. The initial *219 officers of Products were: Sol Goldenberg, president; Francis L. Beiter, vice president; Jack Helfend, secretary-treasurer; and Jerome Goldenberg, assistant secretary and assistant treasurer. Sol, Beiter and Helfend were the directors. In March 1956, Beiter left the corporation and was replaced as vice president and director by Johnson. At the time of the transaction with the Foundation, Sol was approximately 33 years old and Jerome was 21 years old. Sol was paid a salary slightly in excess of $20,000 per year as president of Products. Jerome was the tire department manager of Products, the same position he had held in the Golden West business immediately prior to the transaction with the Foundation. His duties involved pricing, billing, inventory control and checking costs, all with regard to tires and tubes only. He was not involved in policy-making or overall management of the corporation. As previously stated, $150,000 of the cash received by the Foundation upon the liquidation of Golden West was required to be used by the Foundation to acquire additional real estate for the business. Accordingly, the Foundation, in February 1952, entered into an agreement to purchase certain real *220 estate located at 2525 Fruitland Avenue, Vernon, California (hereinafter sometimes referred to as the "Fruitland Avenue property"), for $185,000, subject to an improvement bond of $4,814.18 and interest thereon. On March 17, 1952, the transaction was consummated and a deed to the Foundation was recorded. In addition to the $185,000 purchase price, the Foundation paid escrow and other costs amounting to $728.75, and subsequently also paid the bond and interest. A deed of trust on the Fruitland Avenue property was given to Sol, as trustee, in accordance with the November 1, 1951, purchase agreement. The property was added to the property leased to Products with no increase being made in the rent payable by Products. Subsequently, the main business operations of Products were moved from the Central Avenue property to the Fruitland Avenue property. On November 1, 1953, the note for $418,729.57 payable by Products to the Foundation, which was due November 7, 1953, was extended by agreement to November 7, 1955, on the condition that Products reduce the unpaid balance to $350,000 on or before November 7, 1954. Sol, who in his capacity as trustee held the note as security under the November *221 1, 1951, purchase agreement, consented to this extension. On November 1, 1954, Products made a payment of $68,729.57 on the note. At the same time, the Foundation agreed to further extend the time for payment of the remaining $350,000 for one additional year, to November 1, 1956, and Products executed a new note for $350,000, due November 1, 1956, to replace the original note. The new note provided, as did the original, that it was to bear no interest until maturity, but interest at the rate of 7 percent per annum thereafter. The new note was endorsed without recourse to Sol, as trustee, replacing the original note as security under the purchase agreement. Sol loaned money to Products as follows: $15,000 in November 1953, $5,000 in November or December 1953, $25,000 in February 1955. Products also borrowed money from Union Bank as follows: $15,000 on February 1, 1954, $40,000 on January 28, 1955, $20,000 on February 1, 1955, and $25,000 on January 19, 1956. Each of these loans was repaid to the bank during the succeeding calendar month. In addition, Products frequently deposited its trade acceptances with Union Bank, receiving advances from the bank thereon. On January 28, 1955, Sol *222 executed a continuing guaranty on behalf of Products to Union Bank, by which he guaranteed payment of loans to Products up to $100,000. The guaranty remained in effect until October 31, 1956. In September 1956, the Central Avenue property was sold to outsiders for $30,000, evidenced by a down payment of $4,000 in cash and a note for $26,000, secured by a deed of trust on the property. In consideration of the Goldenbergs releasing their deed of trust on the property, they were assigned the purchase money note and deed of trust, and the net cash proceeds of the down payment ($3,794.20), to be applied against the unpaid balance owing to them under the November 1, 1951, purchase agreement. On October 1, 1956, the Foundation executed and delivered to Sol, as trustee, a note for $116,770.57, representing arrearages in payment of amounts due under the purchase agreement. The note bore interest at the rate of five percent per annum and was due on or before September 1, 1961. It was subsequently paid in full by the Foundation. The sales of Products and its net income before accrual of rent to the Foundation, as shown in its books and income tax returns, were as follows: Net income before
Year ended
rent to Foun-
October 31
Sales
dation
1952
$2,041,130.61
$400,076.94
1953
1,563,533.35
249,391.21
1954
1,645,683.55
215,049.56
1955
1,988,416.74
292,192.23
1956
2,436,484.49
323,575.03
Products, *223 with the approval of the Foundation, expended the following amounts on behalf of the Foundation for the purchase and installation of machinery and equipment and building improvements to the Fruitland Avenue plant during the term of the lease and credited these amounts against the rent due: Year ended
Machinery and
Building im-
October 31
equipment
provements
Total
1952
$ 55,067.56
$5,287.12
$ 60,354.68
1953
129,757.54
129,757.54
1954
24,718.57
24,718.57
1955
8,775.87
8,775.87
1956
17,550.59
17,550.59
Totals
$235,870.13
$5,287.12
$241,157.25
The amounts payable as rent by Products to the Foundation were accrued and paid as follows: Accrued
Year ended
October 31
Amount
1952
$ 320,061.55
1953
199,512.97
1954
172,039.65
1955
233,994.12
1956
258,860.02
Total
$1,184,468.31
Paid
In cash
$ 939,501.73
Credit for assets purchased
243,657.25 [3]
Other credits
1,309.33
Total
$1,184,468.31
On its income tax returns for its fiscal years ended October 31, 1952, through October 31, 1956, Products claimed deductions for the amounts so accrued on its books as rent. Respondent disallowed the amount claimed *224 in each year "due to lack of substantiation that such disallowed amount constitutes a proper deduction." In lieu of the deductions claimed, respondent allowed deductions for the "use of property" as follows: Year ended
October 31
Amount
1952
$11,672.95
1953
20,055.29
1954
25,181.16
1955
26,195.46
1956
26,845.52
Prior to October 31, 1956, Products paid dividends as follows: Feb. 1955
$4,800 ( $5 per share)
Feb. 1956
6,720 ( $7 per share)
The Camelback Corporation (hereinafter sometimes referred to as "Camelback") was incorporated in California on October 8, 1956. Its capital stock was held as follows: Issued in the
Number of
Amount
name of
Shares
Paid
Jack Helfend
150
$15,000
John C. Johnson
100
10,000
David Belinkoff
100
10,000
Morris Donin
50
5,000
Fred Campbell
30
3,000
Harvey S. Morse
25
2,500
Barney Morse
25
2,500
Robert S. Torian
20
2,000
Total
500
$50,000 Morris Donin was an insurance agent who sold insurance to the company and to Sol and Jerome individually. Fred Campbell and Robert S. Torian were employees of Camelback. Harvey S. Morse was a friend of Belinkoff. As of October 31, 1956, when its lease from the Foundation terminated, Products surrendered the leased property to the Foundation. The Foundation thereupon leased *225 the same property on substantially the same terms to Camelback for a five-year term, beginning November 1, 1956. The lease to Camelback provided for a rent of 80 percent of net profit before taxes, the same as in the prior lease to Products. No attempt was made by Camelback to negotiate for a lower rent. By a written agreement dated October 31, 1956, Products sold substantially all its assets to Camelblack for $687,401.80. Camelback assumed liabilities of Products aggregating $463,040.11 and paid the balance of $224,361.69 in installments, $40,000 immediately and the remainder, with interest, in January 1957. Included among the liabilities assumed by Camelback was the $350,000 owing on the note given by Products to the Foundation. Camelback executed and delivered to the Foundation a new note for $350,000, dated November 1, 1956, to replace the Products note. This new note was due and payable November 1, 1961, and like the earlier notes bore no interest until after its due date. Sol, as trustee for the Goldenbergs, agreed to accept the note as security in substitution for the note of Products, and it was endorsed to him by the Foundation without recourse. After the transaction with *226 Camelback was completed, Products was liquidated and dissolved. Liquidating dividends were paid in cash as follows: Shares held in
No. of
Amount
the name of
Shares
paid
Sol Goldenberg
240
$ 40,514.52
Jerome Goldenberg
240
40,514.52
Jack Helfend
110
18,569.15
John C. Johnson
70
11,816.73
David Belinkoff
100
16,881.04
Gendel & Raskoff
40
6,752.42
Mildred Spencer
160
27,009.67
Total
960
$162,058.05
As of December 31, 1956, the balance owed by the Foundation on the original purchase price of $2,720,299.13 had been reduced to $1,645,008.64 by payments and credits as follows: Down payment
$ 100,000.00
Payments out of amounts received
by the Foundation from Prod-
ucts: As rental
753,942.50
As payment on note for pur-
chase of assets
68,729.57
Proceeds from sales of equipment
5,946.00
Proceeds from sale of Central Ave-
nue property (cash of $3,794.20
and trust deed of $26,000)
29,794.20
Note of Foundation for arrearages
116,770.57
Credit for undisclosed liability
107.65
Total
$1,075,290.49 Camelback did business under the name "Golden West Rubber Products." Its employees were, for the most part, the same individuals who had worked for Products. Its officers were: John C. Johnson, president; David Belinkoff, vice president; Jack Helfend, secretary-treasurer. *227 The three officers were also the directors of the corporation. Sol, who was not a stockholder, officer or director of Camelback, was employed under a contract to serve the corporation as "Business Manager" for a two-year period commencing November 1, 1956, at a salary of $26,000 per year. Sol was required "to devote such time to the performance of his duties as business manager as may be reasonably necessary and required therefor" and was not to compete with the corporation during the term of his employment. His employment agreement was renewed, on the same terms, for successive one-year periods commencing November 1, 1958, and November 1, 1959. The services Sol performed for Camelback included negotiating large purchase contracts with suppliers, conducting negotiations concerning union contracts, and serving as a consultant to the management. He continued to serve the corporation in the same position until his death on January 8, 1960. Jerome managed the tire department of Camelback, with the same duties he had performed for Products. He was not an officer, director, or stockholder of Camelback. As president of Camelback, Johnson initially received a salary of $1,000 per month, which *228 was increased to $1,200 per month effective November 1, 1958. Helfend, as secretary-treasurer, initially received a salary of $800 per month, which was increased to $900 per month effective February 1, 1958, and to $1,000 per month effective November 1, 1958. Upon the death of Sol, the duties previously performed by Sol were divided between Johnson and Helfend, and their respective monthly salaries were further increased. As a condition to the extending of financing to Camelback, Union Bank required that the obligation evidenced by Camelback's $350,000 note to the Foundation be subordinated to any indebtedness of Camelback to Union Bank. The Foundation agreed to such subordination by a written instrument dated January 11, 1957. Sol, to whom the note had been endorsed as security, also consented to the subordination and delivered the note to Union Bank for safekeeping. From January 15, 1957, to November 29, 1960, Camelback made a total of ten loans from Union Bank, ranging in amount from $25,000 to $240,000. Each of these loans was repaid to the bank in one to six monthly installments. In addition, Camelback frequently received advances from Union Bank on its trade acceptances, as Products *229 had done. Tread Rubber Corporation (hereinafter sometimes referred to as "Tread") was incorporated in California on December 9, 1960. Its initial shares of stock were authorized by its directors to be issued as follows: No. of
Amount to
Name
Shares
be Paid
John C. Johnson [4]
190
$19,000
Jack Helfend
190
19,000
Fred Campbell
30
3,000
Roy Hardin
30
3,000
Robert Torian
20
2,000
Jerome Goldenberg
20
2,000
David Belinkoff
20
2,000
Total
500
$50,000
The officers of Tread since its formation have been: John C. Johnson, president; Bettie Barnes Johnson, vice president; Jacqueline Iris Helfend, vice president; Jack Helfend, secretary-treasurer. The four officers are also the directors of the corporation. As of December 31, 1960, the lease between the Foundation and Camelback which was to have expired on October 31, 1961, was terminated by mutual consent. *230 The Foundation thereupon leased substantially the same assets to Tread for a 10-year term beginning January 1, 1961. It was provided in the lease that the rent would be an amount equal to 80 percent of Tread's net profits before taxes, until a total of $174,350 had been paid or accrued as rent, and thereafter the rent would be an amount equal to 50 percent of such net profits. Tread was granted two renewal options, for successive periods of ten years each, the first at a rent equal to 45 percent of net profits and the second at a rent equal to 40 percent of net profits. The lease provided certain limitations on salaries to be paid to Johnson and Helfend, and also provided that if the rent paid for each of two consecutive lease years was less than $150,000, the lease could be cancelled at the option of either party. The $174,350 figure in the lease was approximately equal to the balance then owed by the Foundation to the Goldenbergs under the November 1, 1951, purchase agreement less $350,000, the amount owed to the Foundation on its note due November 1, 1961. At the same time as the lease to Tread was executed, Camelback, by a written agreement, sold all its assets to Tread, in exchange *231 for the assumption by Tread of all the liabilities of Camelback (except liabilities for payment of taxes) and the payment of $232,015.30. Included among the liabilities assumed was the $350,000 promissory note of Camelback to the Foundation, which had been assigned by the Foundation to Sol, as trustee, as security. After the transaction with Tread was completed, Camelback was liquidated and dissolved. Tread did business under the name "Golden West Rubber Products." As of June 15, 1961, the balance owed by the Foundation to the Goldenbergs under the November 1, 1951, purchase agreement was $475,406.36. On June 15, 1961, Tread, the Foundation, and Union Bank, as trustee under Sol's will, entered into an agreement which provided as follows: On or before October 31, 1961, the Foundation would pay to the Goldenbergs the sum of $125,406.36, reducing the balance it owed to them to $350,000 ($178,220 to Ida and Jerome together and $171,780 to Sol's estate). Tread would then satisfy the $350,000 obligation of Camelback to the Foundation (and the Foundation's remaining $350,000 obligation to the Goldenbergs) by paying $178,220 to Ida and Jerome on or before October 31, 1961, and by giving Union *232 Bank, as trustee, a note for $171,780, due and payable February 15, 1963. This note was to bear interest at the rate of 7 1/2 percent per annum and was payable in monthly installments of $15,000 or more, plus accrued interest, commencing May 25, 1962. The agreement provided that the payments and the delivery of the note, as provided therein, would fully satisfy the obligations of the Foundation to the Goldenbergs and of Camelback to the Foundation. The chattel mortgage and the deed of trust held by the Goldenbergs were to be released, but the note payable by Tread to the Union Bank was to be secured by a new deed of trust executed by the Foundation on the Fruitland Avenue property. To enable Tread to make the $350,000 payments, the Foundation agreed in a separate instrument to defer collection of $350,000 of rent payable by Tread ($39,838.65 owed by Camelback and assumed by Tread, and the first $310,161.35 of rent payable under the lease to Tread). The rent so deferred was to be paid by Tread, with interest at the rate of 4 1/2 percent per annum, in specified annual installments beginning on or before October 31, 1963, and ending on or before October 31, 1970. The latter date could *233 be extended to October 31, 1972, if Tread exercised its option to renew its lease. The payments of $125,406.36 by the Foundation and $178,220 by Tread were made to the Goldenbergs as agreed, and the balance owed to Ida and Jerome was thus fully paid. Ida and Jerome acknowledged full payment by a written instrument dated September 21, 1961. Jerome managed the tire department of Tread for several months after its formation, but then left the employ of the corporation and joined one of its competitors. At that time he sold his stock in Tread back to the corporation. Ida has not participated in any manner in the business conducted by Products, Camelback or Tread. The adjusted bases of Sol, Ida and Jerome for their respective interests in the property sold to the Foundation under the November 1, 1951, purchase agreement were as follows: Sol - Golden West stock and interest
in the Partnership
$156,460.26
Ida - Golden West stock and interest
in the Partnership
$130,168.20
- Central Avenue Property
15,100.52
Total
$145,268.72
Jerome - Interest in the Partnership
$ 26,292.05
On their respective income tax returns for 1955 and 1956, Sol, Ida and Jerome reported the amounts received from the Foundation as *234 proceeds from an installment sale and treated the portion they computed to be gain as long-term capital gain. Their returns showed the following: Total Re-
Gain Re-
Year
ceipts
ported
Sol
1955
$ 83,754.43
$ 73,416.20
1956
213,625.75
187,256.86
Ida
1955
80,324.40
70,709.57
1956
204,877.01
180,353.23
Jerome
1955
6,569.97
4,878.93
1956
16,757.52
12,444.32
In the notices of deficiencies, respondent determined that the entire amounts received from the Foundation in each year were taxable as ordinary income. Products had neither title to nor equity in the property covered by the lease dated November 7, 1951. The fair rental value of the assets covered by that lease, determined under a percentage method, was an amount equal to 55 percent of the net profits of Products, as defined in the lease. Court of Claims Litigation On their respective income tax returns for the calendar year 1954, Sol, Ida and Jerome had reported the amounts received from the Foundation during that year in the same manner as they reported the amounts received during 1955 and 1956 on their respective returns for those years. Respondent issued deficiency notices to each for 1954, stating in each notice as follows: It is held that you received *235 ordinary income from the continuance of a business as a result of an arrangement with University Hill Foundation in lieu of a long-term capital gain reported by you. Sol, Ida and Jerome paid the deficiencies as determined, and thereafter filed claims for refund, alleging that respondent had erred in treating the receipts from the Foundation as ordinary income. No action having been taken on the claims after six months, they filed petitions in the United States Court of Claims to recover. The three cases were consolidated for trial and a trial was held on September 24 and 25, 1959. The Court of Claims, in a decision issued on January 18, 1961, held for the Goldenbergs on this issue. Union Bank v. United States, 285 F. 2d 126, 152 Ct. Cl. 426 (1961). The Court of Claims made extensive findings of fact, a number of which are identical in content to some of our findings herein. It also made certain other findings, based upon evidence presented to it but not presented herein, relating to the history, nature and growth of the Golden West business; the negotiations between the Foundation and the Goldenbergs leading to the execution of the purchase agreement; the drafting of the agreement; *236 the payments made by the operating companies to the Foundation; and the payments made by the Foundation to the Goldenbergs. The court found as facts that as of July 15, 1959, the balance owed by the Foundation to the Goldenbergs under the purchase agreement was $892,422.24, and that, considering the rate of prior payments and the operations of Camelback, there was a reasonable expectation as of September 1959 that this balance would be paid in full on the date due, October 31, 1961. The court also found that, as of October 31, 1951, the fair market value of the Golden West business to a "normal taxpaying investor" was $1,174,006.23, and that in view of the Foundation's tax exemption, the terms of payment under the purchase agreement, and the fact that payment was to be made only out of rents received from the operating companies, the Foundation "could afford to pay a considerably higher price than the normal investor." It found that "Under such circumstances, the purchase price to the Foundation ($2,720,299.13) was not unreasonable or excessive." At the trial before this Court, the entire record of the Court of Claims proceeding was introduced into evidence, for the purpose only of *237 establishing what that record contained, not as evidence of the facts described therein. Opinion Docket Nos. 78723, 78724, 78725 The issue to be determined in these dockets is whether the payments received by the Goldenbergs in 1955 and 1956 pursuant to their agreement with the Foundation represented proceeds from the sale of capital assets, as petitioners contend. Respondent maintains that there was actually no sale within the contemplation of the Code and that the payments are profit distributions taxable in their entirety as ordinary income. Alternatively, he contends that at least a portion of the payments should be taxed as ordinary income even if it be found that there was a bona fide sale. In an earlier case involving payments received in 1954 pursuant to the same agreement with the Foundation, the Court of Claims held that the Goldenbergs were entitled to capital gain treatment. Union Bank v. United States, supra. Petitioners assert that the parties, controlling facts, issue and applicable legal rules are the same here as they were in the prior proceeding, and that, therefore, the decision of the Court of Claims is conclusive here under the doctrine of collateral estoppel. *238 In Commissioner v. Sunnen, 333 U.S. 591 (1948), the Supreme Court described collateral estoppel as a principle "designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally." Under this doctrine, a judgment on the merits operates as an estoppel to a subsequent proceeding between the same parties involving taxes for a different taxable year, where the issue in the subsequent suit is the same as that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. Commissioner v. Sunnen, supra; Fairmont Aluminum Co. v. Commissioner, 222 F. 2d 622 (C.A. 4, 1955), affirming 22 T.C. 1377 (1954); Commissioner v. Texas-Empire Pipe Line Co., 176 F. 2d 523 (C.A. 10, 1949), affirming 10 T.C. 140 (1948). In Wobber Brothers, 31 B.T.A. 133 (1934), as in this case, the issue was the proper treatment of amounts received by the petitioner pursuant to certain installment sale contracts. The payments in question were received during the year 1925. The respondent contended that the payments constituted income to the petitioner, while the petitioner maintained that *239 the payments were a return of capital. We held that our decision in an earlier proceeding, in which we had determined that payments received by the same petitioner in 1924 pursuant to the same contracts were taxable, was conclusive in the subsequent proceeding. See also Tait v. Western Md. Ry. Co., 289 U.S. 620 (1933). The facts show that the parties here are the same as the parties to the Court of Claims proceeding. The issue here - whether the payments received by the Goldenbergs represented proceeds from a sale of capital assets or ordinary income - was likewise the issue in the prior proceeding. Respondent admits that the payments involved here were made pursuant to the same purchase agreement involved in the prior proceeding. The Court of Claims examined this purchase agreement and the evidence of record concerning the surrounding facts and circumstances and concluded that the Goldenbergs were entitled to capital gain treatment on the amounts they received in 1954 pursuant to the agreement. It analyzed the transaction as follows: From the standpoint of the Goldenbergs, they were, before the 1951 transaction, the owners of valuable properties and a valuable going business. The *240 Government takes no exception to the trial commissioner's finding that the fair value of these assets to the normal taxpaying investor would have been $1,174,006.23. After the 1951 transaction the Goldenbergs had no interest in these assets except a security interest, the power to take them back in case of default in payment for them. If they increased in value because of general prosperity or business success, or in dollar value because of inflation, the Goldenbergs would get no part of that important incident of ownership. If the Foundation had defaulted and the Goldenbergs had got their property back, and had again operated it and made profits from it, they would of course have had to pay ordinary income tax on those profits. They did not and will not get the property back, and when the final payment is made by the Foundation in 1961, even their security interest in the property will be gone, and they will have no relation whatever to it. It is clear that no change has occurred in the applicable legal principles since the decision of the Court of Claims. See Commissioner v. Brown 325 F. 2d 313 (C.A. 9, 1963), affirming 37 T.C. 461 (1961); Royal Farms Dairy Co., 40 T.C. 172 (1963), *241 on appeal (C.A. 9, October 1, 1963); and Anderson Dairy, Inc., 39 T.C. 1027 (1963), on appeal (C.A. 9, September 11, 1963), involving similar transactions. Respondent maintains, however, that collateral estoppel is not applicable in this case because the controlling facts are not the same here as in the prior proceeding. The Supreme Court, in Commissioner v. Sunnen, supra, recognized that "a subsequent modification of the significant facts" might make an earlier determination "obsolete or erroneous, at least for future purposes" and stated that the perpetuation of such error is "neither necessitated nor justified by the principle of collateral estoppel." Therefore, the decision in the earlier proceeding will not constitute a bar to litigating the same issue in the later proceeding if there has been a material change in the significant facts which may reasonably be calculated to alter the situation, T. M. Stanback, 27 T.C. 1, 13 (1956), reversed on another ground, 271 F. 2d 514 (C.A. 4, 1959); cf. Parker v. Westover, 221 F. 2d 603 (C.A. 9, 1955), but not merely additional or different evidence of historically past events and actions which took place prior to the first hearing *242 and are static in character. Jones v. Trapp, 186 F. 2d 951 (C.A. 10, 1950); T. M. Stanback, supra; Stern & Stern Textile, Inc., 26 T.C. 1000, 1003 (1956), affd. 263 F. 2d 538 (C.A. 2, 1959). Although certain evidence was presented to us which was not introduced in the Court of Claims proceeding, some of this additional evidence relates to events occurring prior to the Court of Claims proceeding and hence does not preclude the application of collateral estoppel. Other evidence does, however, relate to events occurring after the Court of Claims proceeding, and the question thus becomes whether this evidence has modified the significant facts in any material respect. In our opinion it has not. The evidence shows that the five-year lease between the Foundation and Camelback, the second operating company, was terminated by mutual consent shortly before its expiration and that the Foundation thereupon leased substantially the same assets to Tread, the third operating company. This transaction was similar in nature to the method by which Camelback had previously succeeded Products, the first operating company. In his testimony before this Court, the president of the Foundation in effect *243 admitted that the successive five-year leases had been tailored to fit the provisions of the Code dealing with unrelated business income of exempt organizations. [5] However, we do not regard this fact, whatever its effect may be upon the tax treatment of the Foundation, as being significant with respect to the tax treatment of the amounts received by the Goldenbergs. Cf. Commissioner v. Brown, supra, involving a similar transaction. [6]
Other new evidence shows that, in 1961, Tread, the Foundation, and Union Bank, as trustee under Sol's will, entered into an agreement providing that the final $350,000 owed by the Foundation *244 to the Goldenbergs was to be paid by Tread, which would simultaneously discharge its $350,000 liability to the Foundation by doing so. As part of this transaction, Union Bank accepted, as payment for that portion of the $350,000 owed to Sol's estate ($171,780) a 7 1/2 percent note of Tread, due February 15, 1963, and secured by a deed of trust on the Fruitland Avenue property. To enable Tread to make payments, the Foundation agreed to defer collection of $350,000 of rent payable by Tread. The facts further show that the business formerly owned by the Goldenbergs is now owned by the Foundation and operated by Tread, a corporation controlled and managed by Johnson and Helfend, in which neither Sol's estate, Ida nor Jerome have any equity interest. Ida and Jerome were fully paid for their respective interests in the Golden West business prior to the due date, October 31, 1961. Ida has not been active in the business in any way since the 1951 transaction and Jerome, who never occupied a prominent position in any of the operating companies, is now associated with a competing business. We have carefully examined and considered the evidence relating to events occurring after the Court of *245 Claims proceeding. Although this evidence shows that the final portion of the Foundation's obligation to the Goldenbergs was discharged in a manner slightly different from that originally anticipated, the events shown do not in our opinion reflect adversely upon the bona fides of the transaction between the Goldenbergs and the Foundation, or otherwise materially modify the significant facts with respect to the treatment of the amounts received by the Goldenbergs in 1955 and 1956, which is the only issue in these dockets. In our opinion, the "controlling facts" in this case are those involving the purchase agreement and the events and circumstances surrounding the transfer of the Golden West business to the Foundation. These very same facts were already fixed at the time of the Court of Claims proceeding and have not changed. Nor has their complexion been modified by events shown to have subsequently occurred. Compare Parker v. Westover, supra. This case is distinguishable from Jack Smith, 32 T.C. 1261 (1959), relied upon by respondent. In that case we held that collateral estoppel was inapplicable because the enactment of a new statute and the promulgation of a new regulation has *246 caused a change or development in the controlling legal principles between the time of the two proceedings. We also held that there were new significant facts to be considered and old facts which took on new significance in light of the change in the law. In the instant case, there are no new significant facts, nor has there been any change in the law to give any of the old facts greater significance. We hold that the decision of the Court of Claims in Union Bank v. United States, supra, is conclusive on the issue of the tax treatment of the payments received by the Goldenbergs in 1955 and 1956. In view of our decision on the collateral estoppel question, we do not find it necessary to reach the merits of the substantive issue in these dockets. However, if we were to decide this issue on the merits, we would apply the principles set forth in Commissioner v. Brown, supra; Royal Farms Dairy Co., supra; Anderson Dairy, Inc., supra; Estate of Ernest G. Howes, 30 T.C. 909 (1958), affirmed sub. nom. Commissioner v. Johnson, 267 F. 2d 382 (C.A. 1, 1959); and Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958). Respondent's alternative argument is that, *247 even if there were a bona fide sale to the Foundation, only the fixed assets of the Golden West business were actually sold to the Foundation, and that the remaining assets were contributed by the Goldenbergs to Products as equity capital. He contends that the portion of the payments to the Goldenbergs to be treated as proceeds from the sale of capital assets should be limited to an amount equal to the fair market value of the fixed assets, and the remainder should be treated as ordinary income. He further contends that if we find that the assets "actually sold" were either (1) all the tangible assets of the Golden West business, or (2) the entire business, then the amount to be treated as proceeds from the sale of capital assets should be limited to the fair market value of those assets. Respondent contends that the doctrine of collateral estoppel does not preclude him from litigating this point here. He maintains that the treatment of the payments in excess of the "fair market value of the property sold" presents a new issue, which was not involved in the first proceeding since the Goldenbergs had not yet recovered such fair market value as of the end of 1954, the taxable year there *248 involved. Petitioners contend that this argument presents no new issue of fact or law, but at best merely a shift in respondent's reasoning. They cite Leininger v. Commissioner, 86 F. 2d 791 (C.A. 6, 1936); Pelham Hall Co. v. Carney, 27 F. Supp. 388 (D. Mass., 1939), affirmed 111 F. 2d 944 (C.A. 1, 1940), and similar cases to the effect that a party may not avoid the application of collateral estoppel merely by advancing a different theory to sustain the contention decided against him in the first action. We agree with petitioners. The issue in the Court of Claims proceeding was whether the amounts received by the Goldenbergs pursuant to their agreement with the Foundation were to be treated as proceeds from the sale of capital assets or as ordinary income. The Court of Claims, examining the agreement and the surrounding facts and circumstances, held that the Goldenbergs were entitled to capital gain treatment. As respondent recognizes, it was implicit in the court's decision that there had been a bona fide sale of the entire Golden West business. [7] The court made a specific finding regarding the fair market value of the business to a "normal tax-paying investor" and held that under *249 the peculiar circumstances of the transaction the purchase price to the Foundation "was not unreasonable or excessive." In its opinion, the court said: The fact that a purchaser of an asset pays more for it than it is worth does not, of itself, convert the sale into something other than a sale, for tax purposes. * * * In Commissioner v. Brown, supra, the Court of Appeals for the Ninth Circuit, commenting upon a similar transaction, stated the following at p. 316: There is no question that this transaction took the form that it did because the Institute is a tax-exempt corporation and that the price to be paid was probably greater for that reason. These facts may have some relevance in connection with possible tax liabilities of the Institute, but they do not, as a matter of law, establish that, so far as the taxpayers were concerned, the sale of their stock was not a genuine sale, which is the only issue involved in this case. In view of the holding of the Court of Claims, we do not think that respondent may *250 now contend that less than the entire Golden West business was sold to the Foundation. Nor may he create a "new issue" by contending that part of the payments received by the Goldenbergs are to be denied capital gain treatment because of the spread between the purchase price and the fair market value of the business, when the Court of Claims expressly held this spread to be reasonable under the circumstances. Even if it be true, as respondent contends, that this proceeding involves payments received after the Goldenbergs had recovered the fair market value of the property sold, while the earlier suit did not, this in our opinion is a distinction without a real difference. The issue here is whether or not the payments are to be treated as proceeds from the sale of capital assets or as ordinary income, which was the same issue decided in the prior suit. We note in passing that as of December 31, 1956, the end of the taxable period here involved, the Goldenbergs still had not received payments totaling $1,174,006.23, the amount held by the Court of Claims to be the fair market value of the Golden West business. We conclude and hold that respondent's alternative argument presents no issue *251 which may properly be litigated here. Respondent also advances another alternative argument in his attempt to tax part of the payments as ordinary income. This argument is that a part of the consideration should be attributed to Sol's covenant not to compete, although respondent does not state what portion he would so allocate. Here again we think that respondent's argument cannot survive the holding of the Court of Claims that the entire amount of the Goldenbergs' gain was taxable as capital gain. Furthermore, the evidence does not show that the covenant was separately bargained for or otherwise dealt with as a separate item, so in any event we would hold for the petitioners on the merits. George H. Payne, 22 T.C. 526 (1954); Aaron Michaels, 12 T.C. 17 (1949). Docket No. 78726 The issue to be determined in this docket is whether Products is entitled to deduct as rent the amounts accrued on its books (and later paid to the Foundation) pursuant to the terms of the lease dated November 7, 1951. Respondent disallowed the amounts claimed as deductions for rent and in lieu thereof allowed certain lesser amounts for the "use of property." The determination of this issue is no way affected *252 by the findings or the decision of the Court of Claims in Union Bank v. United States, supra.Products, the petitioner in this docket, was neither a party to the prior suit nor in privity to any of the parties thereto, and the issue of the rent deduction was not involved therein. Cf. American Range Lines, Inc., 17 T.C. 764 (1951), affd. 200 F. 2d 844 (C.A. 2, 1952). Section 162(a) of the Internal Revenue Code of 1954 allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including: (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. Section 23(a) of the 1939 Code, which governs Products' taxable years ended October 31, 1952, 1953 and 1954, contains an identical provision. On the basis of the evidence of record, we have concluded that Products had neither title to nor equity in the property covered by the lease. In this respect, the case is distinguishable from our recent decision in Warren Brekke, 40 T.C. 789 (1963), *253 on appeal (C.A. 9, March 24, 1964). In Brekke, the circumstances of record, including the fact that the bulk of the leased assets were transferred to a corporation wholly owned by one of the sellers approximately 5 1/2 years after the original transaction, convinced us that the purported lessee actually had an equity interest in the property. The facts here are not comparable. Since the Code does not limit deductions for rental payments to a "reasonable allowance" as in the case of salary or compensation, Stanley Imerman, 7 T.C. 1030, 1037 (1946), we next turn our attention to the question of whether the amounts paid as rent were in fact or law in excess of what was required to be paid as a condition to the continued use and occupancy of the property. Royal Farms Dairy Co., supra; Anderson Dairy, Inc., supra; Herbert Davis, 26 T.C. 49, 56 (1956); Roland P. Place, 17 T.C. 199, 203 (1951), affd. per curiam 199 F. 2d 373 (C.A. 6, 1952). As evidence on this point we have before us the lease itself, which required Products to pay as rent an amount equal to 80 percent of its net profit before taxes. However, no evidence has been presented of any negotiations, arm's-length or otherwise, *254 leading to the adoption of this 80 percent figure. To the contrary, the evidence affirmatively shows that the figure was part of the standard structure created by the Foundation in its acquisition of the Golden West business and other businesses. Certain testimony indicates that the 80 percent figure was set with a view to the profits to be made from the entire "operation," and was not considered to be merely a fair return on the property leased. [8] *255 The value of the "operation" included, in addition to the leased assets, the current assets purportedly sold by the Foundation to Products, the competence and skill of the management, and the other factors making up the total business enterprise. Other testimony indicates that it was contemplated that a rent equal to 80 percent of the profits of the "operation" would provide sufficient funds to the Foundation to pay the indebtedness to the Goldenbergs within the required period. [9] The lease *256 to the second operating company, Camelback, also provided for a rent of 80 percent of net profits, and no attempt was made by Camelback to negotiate for a lower rent. The general pattern in the similar transactions entered into by the Foundation with other businesses was to reduce the 80 percent figure after the sellers of the business had been fully paid, and this pattern was followed in this transaction. In the lease to Tread, the third operating company, the 80 percent figure was scheduled to drop to 50 percent when the total rentals accrued or paid under the lease had reached an amount which, when added to the $350,000 still owed to the Foundation by the operating companies for the purchase of assets, approximately equalled the remaining balance of the purchase price. In our opinion, the evidence clearly leads to the conclusion that the rental provisions of the lease were not intended to provide a fair rental rate for the leased assets, but were merely part of a package arrangement subordinated to the sale of the Golden West business, the primary purpose of which was to provide the Foundation with sufficient funds to pay its obligation to the Goldenbergs. The record before us is *257 in this regard similar to that in Royal Farms Dairy Co., supra, and we reach the same result here as we reached in that case. We conclude and hold that, to the extent the amounts paid by Products to the Foundation as "rents" exceeded a fair rate of rental, such amounts were not required to be paid as a condition to the continued use and occupancy of the property. We must now determine the portion of the rental payments "required" to be paid, within the meaning of the statute. Our inquiry is directed to finding the reasonable rental value of the property. See Royal Farms Dairy Co., supra; J. J. Kirk, Inc., 34 T.C. 130 (1960), affd. 289 F. 2d 935 (C.A. 6, 1961). The property covered by the lease included the Central Avenue property and the machinery and equipment acquired by the Foundation upon the liquidation of Golden West. Our findings concerning the fair market value of these assets at the time of the transaction are based upon the testimony of respondent's expert witness, which in this regard does not seem to have been subjected to any specific criticism by petitioners. We believe that his methods of valuation were proper under the circumstances and that the amounts to which *258 he testified are amply supported by other evidence of record. He further testified that a fair annual rental for these assets would be amounts equal to the following precentages of the value of the respective assets: Central Avenue land, 7 per cent; Central Avenue buildings, 13 percent; machinery and equipment, 27 1/2 percent. Based upon these figures, a fair total annual rental for the aforesaid assets would be $51,655. This, we note, is a substantially greater amount than respondent determined to be deductible in any of the years in question for the use of all the property leased. The property for which the rentals under the lease were being paid also included other property acquired after the commencement of the lease term. The Fruitland Avenue property was acquired by the Foundation on March 17, 1952, for $185,000, and became the headquarters for the main business operations of Products. It was added to the lease, at no increase in rental, pursuant to a provision in an addendum to the lease. Additional machinery and equipment and building improvements were also acquired during the term of the lease, at a total cost of $241,157.25, and were added to the leased property at no increase *259 in the rental. In addition to the tangible assets mentioned above, the lease also covered certain intangibles, described in the lease as "the name and good will of 'GOLDEN WEST' in connection with any business trade-name; and secret processes and formulae." Apparently the only good will contemplated as being covered by the lease was that which attached to the name "Golden West." We believe that this name, which had been used for a number of years in connection with the tire and rubber business carried on by members of the Goldenberg family, did have considerable value. However, we do not think that the most substantial portion of the good will of the Golden West business was attached to the name or was in any way capable of being "leased" to Products. In George W. Staab, 20 T.C. 834, 840 (1953), we defined good will as follows: Good will, then, is an intangible consisting of the excess earning power of a business. A normal earning power is expected of the business assets, and if the business has greater earnings, then the business may be said to have good will. This excess in earning power may be due to any one or more of several reasons, and usually this extra value exists only because *260 the business is a going concern, being successful and profitable. See also Dodge Brothers v. United States, 118 F. 2d 95, 100 (C.A. 4, 1941). We think that the major portion of the "excess earning power," or good will, of the Golden West business resulted from such factors as the competence and efficiency of the team of management and employees and the constant personal contact between the salesmen and customers. These elements of "going concern" value could not be "leased" merely by allowing a lessee to use the name "Golden West," because they never became the property of the Foundation. To the extent that these elements of good will survived the liquidation of Golden West and the Partnership, they passed for the most part directly to Products, the successor corporation, by virtue of the association of the Golden West executives and employees with that company. Therefore, as we view the situation, the leased assets consisted of the real estate, the machinery and equipment and other capital improvements, the name "Golden West" and the secret processes. Although the evidence of record as to the value of the intangibles is not as conclusive as it might be, we conclude on the basis of *261 the record as a whole that the fair rental value of the leased assets, determined under a percentage method, was an amount equal to 55 percent of the net profits of Products, as defined in the lease to Products. We direct that, in the Rule 50 computation, the allowable rental deduction be determined by application of the formula specified in the lease between the Foundation and Products except that 55 percent shall be substituted for 80 percent wherever the latter figure appears. Except to the extent we have found that reasonable rental exceeded the amounts allowed by respondent as deductions, petitioners have not shown error in respondent's determination. Products, in its amended petition, also seeks to shift the amounts claimed as rental expense from its income to that of the Foundation on the alternative theory that the Foundation was a joint venturer with it, sharing the profits of the business. This theory has no support in the record. There is no evidence that the business was organized to carry out a specific venture, see Estate of L. O. Koen, 14 T.C. 1406 (1950), nor is there any evidence that Products and the Foundation had any intention of becoming joint venturer or that *262 any of the attributes of a joint venture were present. Cf. Roland P. Place, supra.Under these circumstances, it is clear that the relationship of Products to the business was not that of a joint venturer. Decision in Docket No. 78724 will be entered for the petitioners. Decisions in Docket Nos. 78723, 78725 and 78726 will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Jerome Goldenberg and Helena Goldenberg, Docket No. 78724; Ida Goldenberg, Docket No. 78725; Golden West Rubber Products, Inc., Docket No. 78726.↩
2. The parties stipulated that Sol died in 1961, but other evidence of record shows the correct date of his death to be as found above. By an order of this Court dated March 9, 1960, "Estate of Sol Goldenberg, Deceased, Union Bank, Executor," was substituted for Sol as a petitioner in Docket No. 78723.↩
*. Includes sales to the Partnership commencing October 26, 1950. ↩
#. All sales were made to the Partnership.↩
*. This figure represents the price assigned to this property in the purchase agreement, not its book value.↩
3. Machinery, equipment and building improvements as per preceding schedule, plus payment of $2,500, the nature of which is not disclosed by the record.↩
4. Johnson testified that, at the time of the trial, he and Helfend each owned 210 shares, and that Campbell, Hardin and Torian owned the remainder. The shares held by Jerome were sold back to the corporation when he left its employ, several months after its formation. The record does not disclose the disposition of the shares which were authorized to be issued to Belinkoff.↩
5. Sections 511-514 of the 1954 Code; sections 421-423 of the 1939 Code. ↩
6. The Court of Appeals stated: Certain aspects of the transaction now before us were undoubtedly "tailored" to fit the law as amended by Congress in 1950, particularly section 101 of the Revenue Act of 1939 as amended, and sections 421, 422, and 423. These sections all relate to the income and tax exempt status of the purchasing Institute; none of them purports to deny to the sellers the right to treat the sale, for tax purposes, as a sale, and therefore to treat moneys received as capital gains. * * *↩
7. In his reply brief respondent states: "In effect, the Court of Claims held that in substance as well as form there was a sale of a total business enterprise to the Foundation."↩
8. Q. In other words, the 80 percent figure was not based upon the value of the property. It was based upon the profits which were to be made? A. [J. P. Carroll, president of the Foundation] I would say the two were taken into consideration. Q. The two factors? A. Yes. * * *
Q. Mr. Carroll, you indicated that the 80 per cent was not peculiar to this transaction but it was a formula that was used in many transactions of this sort. That in itself indicates that the return that the Foundation was going to get was not based upon the value of the property, does it not? A. It was the value of the operation. Q. Value of the operation? A. You can't separate the property from the operation. ↩
9. Q. * * * Now, in the case of the Foundation in this transaction with the first lessee, according to what you have indicated to me, an 80 per cent figure was used, 80 per cent of profits, and that didn't bear any relationship to the value of the property, did it? A. [Carroll] Well, I think that you have to combine any business - you have to combine the property and the operation. The 80 per cent figure on what the earnings of the company were certainly was a true rental. I think the best proof of that is that after a period of some nine years the Foundation now owns a $3,000,000 asset of which we can't earn less than 5 per cent or $150,000. Therefore, the computations in 1951 must have been correct or we wouldn't have acquired this property. [Italics added.]↩