Sparks Nugget, Inc., et al. [1] v. Commissioner. Sparks Nugget, Inc. v. Commissioner
Docket Nos. 4237-67, 4277-67 - 4280-67.
United States Tax Court
T.C. Memo 1970-74; 1970 Tax Ct. Memo LEXIS 279; 29 T.C.M. (CCH) 318; T.C.M. (RIA) 70074; March 31, 1970, filed *279 C Corp., SD Corp., and XYZ Corps. were wholly owned by the Graves. C Corp. leased land from SD Corp. and slotmachines from XYZ Corps. Held: (1) C may not deduct, under sec. 162(a)(3),I.R.C. 1954, the amounts paid to SD as rentals, to the extent that such amounts exceed the reasonable rental of the property. (2) The Graves are collaterally estopped from contesting our determination in The Challenger, Inc., 23 T.C.M. 2096, 33 P.-H. Memo. T.C. par. 64,338 (1964), of the reasonable monthly rental of each slot machine. 319 (3) Excessive amounts allegedly paid as rental by C to its sister corporations are constructive dividends to the Graves; and (4) The compensation paid by SD to Mr. Graves for personal services was reasonable. Valentine Brookes, 1600 *281 International Bldg., 601 California St., San Francisco, Calif., for the petitioners. Gordon B. Cutler, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: The respondent determined liabilities of the petitioners as follows: Docket No.
Petitioner
Basis of Liability
Taxable Year Ended
Deficiency
4237-67
Sparks Nugget, Inc
Transferee
9/30/59
$ 69,622.34/30/59
$69,622.34
4277-67
Sparks Development Co
Income tax deficiency
11/30/61
9,940.29
4278-67
Flora J. Graves
Income tax deficiency
12/31/59
29,083.17
4279-67
R. L. Graves and Flora J. Graves
Income tax deficiency
12/ 1/60
137,209.56
4280-67
R. L. Graves
Income tax deficiency
12/31/59
29,083.17
Some of the issues in this case have been settled; those remaining for decision are: (1) Whether The Challenger, Inc. (Challenger), can deduct, under section 162 of the Internal Revenue Code of 1954, [2] the full amount of payments it made with respect to certain lots leased by it from Sparks Development Co. (Sparks Development). (2) Whether, *282 for purpose of determining the tax liability of R.L. and Flora J. Graves (the Graves), Challenger should be limited to $2.59 per month in rental deductions, under section 162, for payments with respect to each slot machine leased by it from The Pub, Inc., Saratoga Club, Inc., and United Waldorf, Inc. (3) Whether the portions of the payments with respect to the lots and the slot machines which are not deductible under section 162 constitute dividends taxable to the Graves. (4) Whether certain payments made by Sparks Development during its taxable year 1961 to Mr. Graves are deductible under section 162 as "a reasonable allowance for salaries or other compensation." Findings of Fact Some of the facts have been stipulated, and those facts are so found. Sparks Nugget, Inc., is a Nevada corporation which had its principal place of business in Sparks, Nevada, at the time its petition was filed in this case. Sparks Development, also a Nevada corporation, had its principal office in Sparks, Nevada, at the time its petition was filed in this case. For its taxable year ending November 30, 1961, Sparks Development filed its Federal income tax return, using the accrual method of accounting, *283 with the district director of internal revenue, Reno, Nevada. The Graves are husband and wife, who maintained their legal residence in Carson City, Nevada, at the time their petitions were filed in this case. They filed their 1959 individual and 1960 joint Federal income tax returns, using the cash receipts and disbursements method of accounting, with the district director of internal revenue, Reno, Nevada. Sparks Nugget, Inc., was incorporated on September 29, 1960. Until June 26, 1961, all of the outstanding stock of the corporation was owned by John J. Ascuaga and his wife, Rose. After such date, the Ascuagas owned 98.8 percent of the outstanding stock, and the Graves owned the remaining 1.2 percent. Mr. Ascuaga has been the principal executive officer of Sparks Nugget, Inc., since its incorporation. On September 30, 1960, Sparks Nugget, Inc., purchased all of the outstanding stock of Challenger from 320 the Graves. Thereafter, on June 30, 1961, pursuant to a plan of complete liquidation, Challenger dissolved and all of its assets were distributed in complete liquidation to Sparks Nugget, Inc. Prior to September 30, 1960, at all times relevant hereto, the Graves owned all *284 of the outstanding stock of Challenger. During such years, Mr. Graves was the principal executive officer of Challenger. From September 30, 1960, to June 30, 1961, Mr. Ascuaga was the principal executive officer of Challenger. Mr. Graves proposed the sale of the Challenger stock to Mr. Ascuaga. Mr. Ascuaga accepted the terms of the proposal without substantial change. The purchase price of the Challenger stock was set at $3,700,000; annual payments in respect of such price were set at the greater of $300,000 or 4.57 percent of Challenger's gross receipts. Sparks Nugget, Inc., agreed that, until the purchase price was paid in full, it would not incur yearly capital expenditures of more than $10,000, without the permission of the Graves. The purchase agreement provided that Mr. Graves would act as a consultant to Sparks Nugget, Inc., for a period of 2 years for an annual compensation of $25,000. Sparks Nugget, Inc., made the final payment in respect of the stock purchase in September 1967. Sparks Development was incorporated on July 31, 1957. Its outstanding stock has always been wholly owned by the Graves; Mr. Graves has always been its principal executive officer. The Pub, Inc. *285 (Pub), Caldwell Sports Shop, Inc. (Caldwell), United Waldorf, Inc. (Waldorf), and Saratoga Club, Inc. (Saratoga), are dissolved Idaho corporations. They were organized in 1947 and at all times relevant hereto, prior to May 31, 1963, were wholly owned by the Graves. During such period, Mr. Graves was the principal executive officer of each corporation. On May 31, 1963, the Graves sold all their stock in the corporations to First National Bank of Nevada, as trustee of certain trusts established by the Graves for their children. On December 31, 1963, all of the corporations were completely dissolved and liquidated by the trustee. I. Rental of Parking Lots On June 17, 1959, Sparks Development leased 6 i/2 lots located in Sparks, Nevada, to Challenger. Challenger used the lots as parking lots in connection with a gambling casino operated by it known as the Sparks Nugget Casino. Such lots are hereinafter referred to as the Parking Lots. Practically all of the customers of the Sparks Nugget Casino travel there by car, and the availability of ample free parking has been a substantial factor contributing toward the casino's success. There is some free on-street parking available in the *286 area of the casino, but such space is insufficient to accommodate all of the casino's patrons. The Parking Lots had originally been acquired by Mr. Graves as follows: Lot
Purchase Date
Purchase Price
Square Feet
Blk. 2
S. 65 feet Lot 1
10/20/58
$ 20,072.35
3,250
Blk. 2 Lot 2
11/24/58
32,170.22
7,000
Blk. 2 Lot 3
4/27/59
41,950.77
7,000
Blk. 4 Lot 5
2/28/59
35,570.41
7,000
Blk. 4 Lot 6
4/23/59
40,350.71
7,000
Blk. 4 Lot 7
1/ 6/59
40,485.25
7,000
Blk. 4 Lot 8
7/23/58 43,009.33
7,000 $253,609.04
45,250 322 On June 3, 1959, Mr. Graves transferred title to the Parking Lots to Sparks Development for cash, an assumption of liabilities, and a note, aggregating in value $253,253.05, and for additional Sparks Development common stock with a par value of $20,000.00. On June 3, 1959, immediately after acquiring title to the Parking Lots, Sparks Development borrowed $150,000 from the Nevada Bank of Commerce on two notes, each bearing 6-percent interest, one being in the amount of $115,000 secured by a first deed of trust on Lots 2 and 3 of Block 2 and Lots 5, 6, and 7 of Block 4, and the other an unsecured note for $35,000. *287 Mr. Graves negotiated the lease of the Parking Lots (sometimes hereinafter referred to as the Parking Lot Lease) on behalf of both Challenger and Sparks Development. Mr. Ascuaga took no part in such negotiation. Mr. Graves fixed the lease rental on the basis of the amount of income that Sparks Development would need to pay his compensation, its income taxes, and its purchase obligations on the Parking Lots. He prepared a pro forma income and expenditures statement which, together with the proposed lease, he took to the Nevada Bank of Commerce. On the basis thereof, the bank agreed to make the purchase money loans necessary for Sparks Development to acquire the Parking Lots. The Parking Lot Lease, executed on June 17, 1959, leased the Parking Lots to Challenger for a term of 5 years commencing June 17, 1959, for the following rental: $9,400 per month for the first year of the lease term and $8,000 per month for the following 4 years of the lease term. The larger rental in the first year of the lease term was provided because of the higher loan payments required of Sparks Development during such period. Under the terms of the lease, Challenger was required to keep the premises in *288 good repair, to pay for all utilities used on the premises, to keep the property free of any mechanics' or other liens, to hold Sparks Development harmless from any suits or claims arising out of the operation of the property, to maintain public liability insurance of not less than $100,000 for injury to one person and not less than $300,000 for injury to more than one person, and to pay all real estate taxes on the premises. The lease provided that upon the expiration of the initial term, Challenger could continue to rent the Parking Lots for an additional 5-year term upon the terms and conditions contained in the lease, except that the rental would be renegotiated. If the parties could not agree on the rental, the matter would be submitted to arbitration. In the event the business of gambling was outlawed on the demised premises, Challenger was given the right to terminate the lease upon the payment of an amount equal to 4 months' rent as liquidated damages. The cost of removal of houses and other improvements on the Parking Lots and the cost of surfacing and marking the lots was borne by Challenger. The lots furnished approximately 143 car spaces. 143 car spaces. On September 30, 1960, Sparks *289 Development modified the Parking Lot Lease by providing that Challenger was granted an option to extend the lease term for an additional period commencing with the expiration of the last renewal term and terminating on September 23, 1987. This extension was made at the insistence of Mr. Ascuaga in connection with the purchase of the Challenger stock by Sparks Nugget, Inc. The renewal was to be upon the same terms and conditions contained in the Parking Lot Lease, except for the rental, which was to be renegotiated each 5 years. In the event of disagreement as to the monthly rental, the matter would be submitted to arbitration in the same manner provided in the Parking Lot Lease. The Parking Lot Lease was renewed in accordance with its terms after the expiration of the initial term in 1964. The rental for the renewal term was not renegotiated and remained at $8,000 per month. Pursuant to the terms of the Parking Lot Lease, Challenger accrued and paid to Sparks Development $37,000 in its taxable year ended September 30, 1959, and $107,200 in its taxable year ended September 30, 1960. The respondent determined that to the extent the monthly payments exceeded $4,000 they "were not *290 required to be made for the use of" the Parking Lots in Challenger's business. Under this computation, Challenger's deductions were reduced to $16,000 for 1959 and $48,000 for 1960. The following information pertaining to other real estate transactions involving the petitioners relates to the question of the reasonable rental of the Parking Lots. The references to Block and Lots numbers correspond to the plan of Sparks set forth previously. 323 A. The McDonald Premises On September 25, 1954, Challenger leased the McDonald premises for a term of 10 years, with a 10-year renewal option, at a monthly rental of $700. The premises consist of Lots 11 and 12 in Block 4 on the north side of B Street and contain approximately 7,000 square feet. On the pr5m9ses# Challenger opened on March 17, 1955, a bar, restaurant, and casino known as the Sparks Nugget. B. The Peterson Premises On April 27, 1955, Challenger leased the Peterson premises for a term of 3 years, with a 7-year renewal option, at a monthly rental of $500, and a further 10-year renewal option at a monthly rental of $700. The premises consist of Lot 10 in Block 4 on the north side of B Street and contain approximately *291 3,500 square feet. The premises were used for an expansion of the Sparks Nugget operation. C. The Zundell Premises On November 21, 1955, Mr. Graves leased the Zundell premises effective January 1, 1956, for a term of 5 years with a 5-year renewal option, at a monthly rental of $700, and a further 10-year renewal option at a rental to be negotiated. The premises consist of Lots 1, 2, and 3 in Block 4 on the north side of B Street and contain approximately 10,500 square feet. On May 28, 1956, Mr. Graves assigned the lease to Challenger. The premises in part were used for storage and in part sublet to unrelated parties. D. The Sparks Nugget Casino Premises On May 1, 1957, Mr. Graves created four irrevocable trusts, each with a corpus of $6,000, one trust for each of his children. The First National Bank of Nevada (hereinafter referred to as the Trustee) was made trustee and given power to commingle the funds of the different trusts. On the same day, the four trusts formed a joint venture called the Graves Children Trust No. 1. The joint venture bought eight lots, Lots 1-8 in Block 3, for a total of $180,134.05. The bank took a mortgage of $153,000 on the property. The eight *292 lots were located across B Street from the then location of the Sparks Nugget Casino which had opened in March 1955. On May 1, 1957, the Trustee leased the eight lots to Challenger for a 10-year term for use as a parking lot. The rent was fixed at $2,500 per month for the first year and was then to be renegotiated but not to exceed $2,750 per month. The premises contain approximately 56,000 square feet. At the time of the Trustee's purchase of the premises, there were situated upon all or part thereof houses and related improvements, which were removed at the expense of Challenger. Challenger also bore the expense of improving the premises thereafter for automobile parking. Challenger was obligated to pay in respect of the premises all taxes and assessments, insurance, utilities, and all other maintenance and operating expenses. On August 29, 1957, Pub, Caldwell, Waldorf, and Saratoga formed a joint venture known as Nugget Enterprises, for the purpose of leasing the eight lots, constructing a casino building thereon, and subleasing it to Challenger. The joint venturers agreed to share the profits and losses equally. On September 23, 1957, the lease of May 1, 1957, between the *293 Trustee and Challenger was cancelled by agreement of the parties thereto. A new lease of the same premises was entered into on the same date between the Trustee and Nugget Enterprises for 20 years at $3,750 per month for the first 5 years. The rent was to be renegotiated each 5 years. Nugget Enterprises had an option to renew for an additional 10 years. The property was to be used for a gambling casino, restaurant, and related facilities. Nugget Enterprises was obligated to pay in respect of the premises all taxes and assessments, insurance, utilities, and all other maintenance and operating expenses. By an agreement dated the same day, September 23, 1957, Nugget Enterprises subleased the same premises to Challenger for 10 years (with an option in Challenger to renew for another 10 years) at $3,750 per month for the first 7 months and $15,000 per month thereafter. On September 30, 1960, the sublease was extended in a manner similar to the extension of the Parking Lot Lease. Challenger was obligated to pay, in respect of the premises, all taxes and assessments, insurance, utilities, and all other maintenance and operating expenses. In accordance with the terms of the sublease, Nugget *294 Enterprises constructed a new casino building on Lots 4, 5, 6, and 37 feet of Lot 7 in Block 3 of the premises. The building was completed on May 12, 1958, at a total cost, as of the end of 1958, of $796,769.81. Lots 1, 2, 3, 8, and 13 feet of Lot 7, continued to be used for casino parking. On May 12, 1958, the Sparks Nugget operation was moved from the McDonald 324 and Peterson premises to the new casino. On May 26, 1958, Challenger assigned the McDonald and Peterson leases to Trader Dick's, Inc., a Nevada corporation owned and controlled by Mr. Graves, for use as a restaurant. On November 1, 1959, Nugget Enterprises completed an enlargement of a boiler room in the casino at a cost of $31,933.65. On January 4, 1960, at a meeting of the board of directors of Challenger, Mr. Graves indicated that the new boiler room was necessary for safety reasons and that a new addition to house a pancake restaurant was desirable. He stated that he estimated the cost of these additions to be $150,000, and that Nugget Enterprises would furnish them if the rental were increased from $15,000 a month to $16,500 a month. The board of directors adopted a resolution approving the improvements and *295 agreeing to the rental increase. On April 1, 1960, Nugget Enterprises enlarged the casino by the addition of a restaurant called the Pancake Parlor at a cost of $88,588.32. The boiler room and pancake restaurant improvements occupied Lot 8 and the remaining 13 feet of Lot 7. Effective March 1, 1960, the rental paid by Challenger to Nugget Enterprises was raised to $16,500 a month. On July 1, 1962, Nugget Enterprises completed a theatre-restaurant and related facilities on Lots 1, 2, and 3 in Block 3 at a cost of $1,650,895.45. The related facilities apparently included 104 small hotel-roomettes available to the public for hire, which were opened in September 1962. Mr. Graves conceived the idea of the theatre-restaurant and was planning it in September 1960. On July 21, 1961, Nugget Enterprises, by Mr. Graves, proposed to the Trustee the construction of the theatre-restaurant on its land and requested that the Trustee give its formal approval to construction. In consideration of such approval, Nugget Enterprises suggested that the monthly rental on the ground lease be increased to $6,000 a month. The proposal was acceptable to the Trustee, and commencing on January 1, 1962, the *296 monthly rental on the ground lease of the casino premises between Nugget Enterprises and the Trustee was increased to $6,000. The construction of the theatre-restaurant commenced in the middle of 1961, and it opened in July 1962. The new boiler room, pancake restaurant, and theatre-restaurant additions nearly doubled the size of the casino building, and utilized areas that previously were used for automobile parking. The opening of the theatre-restaurant increased the need for parking, particularly because of large crowds at show times. In connection with the construction of the theatre-restaurant, the Trustee acquired a 6-foot strip of adjoining land (6 feet X 140 feet) from the City of Sparks by trade for a similar 6-foot strip of Lot 8 in Block 4 owned by Sparks Development. Although the 6-foot strip, which was traded to the City of Sparks, was owned by Sparks Development and was leased by Challenger under the Parking Lot Lease, there was no reduction in the rental paid by Challenger to Sparks Development for the loss of the 6-foot strip, nor was any effort made to secure such a reduction. On January 1, 1962, the rental paid by Sparks Nugget, Inc., to Nugget Enterprises for *297 the eight lots was raised to $24,000 a month, and on July 1, 1962, the rental was raised to $55,708.77 a month, pursuant to the terms of an agreement dated November 14, 1961. E. The Hanson Premises On December 12, 1958, Sparks Development leased eight half lots from Frank E. and Rose Hanson for $1,000 a month for a term of 5 years with an option to renew for 5 years on the same terms, and a further option to renew for 10 years at a rental to be negotiated. The half lots are Lots 5, 6, 7, 8, 9, 19, 20, and 21 in Block 5; each is 25 feet wide and 140 feet deep. A brick market building was situated on half lots 5, 6, and 7. From time to time, Sparks Development rented out the building for various uses at $700 a month. The Hanson premises contain 28,000 square feet, of which 17,500 square feet is available for parking. On December 12, 1958, Sparks Development subleased half lots 8, 9, 19, 20, and 21 to Challenger for $1,000 a month for automobile parking purposes. In 1963, Sparks Development renewed the Hanson lease on the same terms, and in 1965, Sparks Nugget, Inc., reconstructed the Hanson building into a convention center. F. The Southern Pacific Railroad Premises On May 15, 1958, Challenger *298 leased vacant unimproved property for parking purposes from the Southern Pacific Railroad at a rental of $100 a month. The lease was terminable by either party on 30 days' notice. 325 The property is 190 feet deep and 508 feet wide, and is located on the south side of A Street between 11th and 12th Streets. Parking improvements were made at Challenger's expense. Challenger was obligated to pay in respect of the premises all taxes and assessments, utilities, and all other maintenance and operating expenses. In April 1962, a new lease was entered into between Sparks Nugget, Inc., and the Southern Pacific Railroad for a term of 5 years at a rental of $290 a month. The lease was terminable by the lessor on 30 days' notice if the property was needed, in the lessor's judgment, for industrial, railroad, or highway purposes. The property included the property previously leased and additional property located south of A Street lying to the west of the property previously leased. The total property leased under this new lease is 190 feet deep and 908 feet wide, being 172,520 square feet. The property was used for automobile parking purposes and all parking improvements thereon were made *299 at the expense of Sparks Nugget, Inc. Sparks Nugget, Inc., was obligated to pay in respect of the premises all taxes and assessments, utilities, and all other maintenance and operating expenses. Further, in the event that assessments for public improvements were made, the lease provided that the rental should be increased by 6 percent of the amount of the assessment per annum. In December 1963, Sparks Nugget, Inc., and Southern Pacific Railroad made a revised lease of the premises for a term of 5 years with a 5-year renewal option. Challenger or Sparks Nugget, Inc., has continually occupied the Southern Pacific Railroad premises since the May 1958 lease. The premises were originally used only for employee parking, but after the need for parking grew, it was also used by casino customers. G. The Laxalt Premises In December 1958, Mr. Graves sold Lot 13 in Block 3 to Paul D. Laxalt, custodian for Mr. Graves' children under the Nevada Uniform Custodian Act, for the sum of $20,000. In August 1959, the custodian leased the lot, containing 7,000 squ1re feet, to Challenger. The lease was for a term of 5 years at $300 a month, with an option to renew for 5 years at a negotiated rent. *300 The cost of removal of the house and related improvements previously situated on the lot and the parking lot improvements were borne by Challenger. On September 30, 1960, the term of the lease was extended in a manner similar to the extension of the Parking Lot Lease. Challenger acquired use of the lot principally for pedestrian access from the casino to the Southern Pacific Railroad premises, but the lot was also used for automobile parking. In 1964, the lease was renewed at the same rental, at which time the property was still used for the same purposes. Mr. Graves fixed the rental on the basis of his estimate of the fair rental value of the property. H. The Nugget Motor Lodge Premises Mr. Graves purchased Lots 4 through 8 in Block 2 on the dates and for the amounts as follows: Lot
Purchase Date
Purchase Price
Square Feet
4
3/30/59
$42,140.96
7,000
5
4/28/59
50,250.56
7,000
6
6/11/59
42,327.25
7,000
7
6/ 8/59
42,344.91
7,000
8
6/ 3/59 42,135.94
7,000 $219,199.62
35,000 The total purchase price was advanced to Mr. Graves by Challenger. In February 1960, Mr. Graves transferred the lots to Challenger in cancellation of that *301 advance, and at about the same time, Challenger conveyed the lots to Nugget Motor Lodge, Inc., a Nevada corporation, in exchange for 2,500 shares of its authorized capital stock of 5,000 shares. The Lodge, which I. The Williams, Peterson, Roche, has 140 rooms, was conceived by Mr. Graves and was opened in 1960. The Lodge building does not occupy the entire 5 lots; there is parking beneath the building and on the balance of the lots. and Church Premises Sparks Development purchased 3 full lots and 3 half lots in 1960 and 1962 as follows: Lot
Seller
Purchase Date
Purchase Price
Square Feet
Blk. 1 Lot 1
Williams
4/13/62
$ 53,009
7,000
Blk. 1 Lot 2
Peterson
7/15/60
35,625
7,000
Blk. 4 Lot 4
Roche
10/29/62
52,961
7,000
Blk. 5 Lots 22, 23, 24
Church
9/ 5/62 33,049
10,500 $174,644
31,500 326 On August 1, 1962, Sparks Development and Sparks Nugget, Inc., entered into a supplemental lease of the Williams, Peterson, Roche, and Church lots. Such lease was for a term ending with that of the Parking Lot Lease. The rental to be charged Sparks Nugget, Inc., was $4,410 a month. J. The State of Nevada Premises On April 1, 1964, the *302 State of Nevada leased to Sparks Nugget, Inc., Lots 9 through 16, except Lot 13 (the Laxalt premises), of Block 3, for use as a parking lot. Such lease was on a month-to-month basis at a rental of $600 per month for the first 22 months and $700 per month thereafter. The premises contained 49,000 square feet. Sparks Nugget, Inc., was obligated to pay all utilities and to keep the premises in good condition. After construction of an elevated viaduct on the premises, the State, in December 1967, made a new lease of the premises, including Lot 13, to Sparks Nugget, Inc., on a month-to-month basis at a rental of $700 a month. The new lease related to premises containing 56,000 square feet. The lessee's use of the premises and obligations were the same as under the first lease. In June 1968, Sparks Nugget, Inc., completed negotiations of a new lease with the State, covering Lots 9 through 16 in both Blocks 2 and 3 (112,000 square feet), for a term of 20 years at an annual rental of $27,500 for the first 5 years. Sparks Nugget, Inc., is obligated to pay taxes and to make all improvements at its own expense. The lease contemplates that the premises will be used for automobile parking, *303 being divided into approximately 312 car spaces. At all times material in this case, neither Challenger, Sparks Development, Pub, Caldwell, Waldorf, nor Saratoga ever paid any dividends to the Graves. Although Mr. Graves recognized that no corporate tax benefit could be obtained by having Sparks Development lease the Parking Lots to Challenger, he felt that such an arrangement could affect the amount of his personal income tax. At the time of the execution of the Parking Lot Lease, Mr. Graves had in mind retiring early from active participation in Challenger's business, and the arrangement concerning the Parking Lots facilitated his sale of Challenger stock, and financially benefitted him after such sale. The reasonable rental of the Parking Lots during 1959 and 1960 did not exceed $4,000 per month. II. Rental of Slot Machines On March 17, 1955, Pub, Saratoga, and Waldorf leased 100 slot machines to Challenger. Such lease continued in effect with terms unchanged until October 1, 1960, when the machines were sold to Challenger by the lessors for $200 per machine. On its Federal income tax returns, Challenger deducted as slot machine rentals $97,336.07 for its taxable year ending *304 September 30, 1959, and $103,821.15 for its taxable year ending September 30, 1960. The respondent does not dispute that such amounts were actually paid by Challenger to the lessors. However, he has determined that Challenger was not required to pay monthly rent exceeding $2.59 per machine. Accordingly, he has reduced the annual rent deductible by Challenger to $3,108 for both of its taxable years, 1959 and 1960. In The Challenger, Inc., 23 T.C.M. 2096, 33 P.-H. Memo. T.C. par. 64,338 (1964), we held that a reasonable monthly rent for the slot machines here in issue did not exceed $2.59 per machine for the taxable years of Challenger 1955 through 1958, and to the extent the claimed deductions exceeded such figure, they did not represent amounts required to be paid for the use of the slot machines in Challenger's business and were not deductible. III. Payments by Sparks Development to Mr. Graves In its taxable year ending November 30, 1961, Sparks Development paid Mr. Graves $8,539.01, which it treated as compensation for services. As in other years, the payment was computed on the basis of 10 percent of the profits of Sparks Development. During the taxable year, *305 Mr. Graves was the president, manager, and sole employee of Sparks Development. Although in prior years, Mr. Graves performed extensive services for Sparks Development in connection with its real estate transactions, during the taxable year his only service to the corporation was his negotiation for the acquisition of the Roche property, which was purchased by Sparks Development on October 29, 1962. Reasonable compensation for Mr. Graves' services during the taxable year was not less than $8,539.01. 327 Opinion The respondent's determinations are predicated on three basic arguments. First, he contends that part of the amounts paid by Challenger under the Parking Lot Lease were excessive and not deductible, and that Sparks Nugget, Inc., is liable as the transferee of Challenger for the resulting deficiencies. Secondly, he asserts that the Graves received constructive dividends when Challenger paid to Pub, Saratoga, and Waldorf excessive rentals for the use of certain slot machines and when Challenger paid to Sparks Development excessive rentals for the use of the Parking Lots. Thirdly, he argues that Sparks Development may not deduct, as compensation, certain amounts it paid *306 to Mr. Graves. At the trial, the respondent adopted the alternative position that section 482 is applicable; however, as a result of our decisions with respect to the other issues, we do not reach that issue. I. Rental of Parking Lots Section 162(a) provides in part as follows: (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. The petitioners point out that section 162(a)(3) does not expressly limit the deduction for rent to reasonable amounts, whereas section 162(a)(1) does limit deductions for salaries or other compensation to reasonable amounts. They contend that if Congress wished to limit rental deductions in the same manner as deductions for compensation, it could easily have done so. *307 According to this argument, the absence of such a limitation reflects the congressional intent that rental deductions should be allowed in toto for all payments made for the purpose of renting property. The petitioners assert that the payments claimed as deductions by Challenger were paid pursuant to a written lease; that the lease required such payments to be made; that Challenger occupied the Parking Lots pursuant to the lease; and that Sparks Development was the sole owner of the Parking Lots. They conclude that whether the payments made with respect to the Parking Lot Lease were reasonable or unreasonable, they are properly deductible as a business expense under section 162. Although the petitioners argue for their position strongly and eloquently, we do not agree. The authorities have differed over the significance of the lack of an express reasonable limitation on the deductibility of rentals under section 162(a)(3). Section 162 limits all deductions for business expenses to those which are "ordinary and necessary." It has been frequently asserted that business expenses which are unreasonable in amount are not ordinary and necessary and therefore not deductible. Sec. 1.212-1(d), *308 Income Tax Regs.; Brown Printing Co. v. Commissioner, 255 F. 2d 436 (C.A. 5, 1958), revg. a Memorandum Opinion of this Court; Commissioner v. Lincoln Electric Co., 176 F. 2d 815 (C.A. 6, 1949), revg. a Memorandum Opinion of this Court, cert. denied 338 U.S. 949 (1950); Limericks, Inc. v. Commissioner, 165 F. 2d 483 (C.A. 5, 1948), affg. 7 T.C. 1129 (1946); I.T. 3581, 1942-2 C.B. 88. Other cases have indicated that, when parties to a lease are unrelated or are otherwise shown to have been dealing at arm's length, rental deductions must be allowed in full with no inquiry into the reasonableness of the amount. Potter Electric Signal and Manufacturing Co. v. Commissioner, 286 F. 2d 200 (C.A. 8, 1961), affg. a Memorandum Opinion of this Court; Utter-McKinley Mortuaries v. Commissioner, 225 F. 2d 870 (C.A. 9, 1955), affg. a Memorandum Opinion of this Court; Anderson Dairy, Inc.39 T.C. 1027 (1963); Coe Laboratories, Inc., 34 T.C. 549 (1960); J. J. Kirk, Inc., 34 T.C. 130 (1960) affd. 289 F. 2d 935 (C.A. 9, 1961); Jos. N. Neel Co., 22 T.C. 1083 (1954); *309 Roland P. Place, 17 T.C. 199 (1951), affd. per curiam, 199 F. 2d 373 (C.A. 6, 1952), cert. denied 344 U.S. 927 (1953); Stanwick's, Inc., 15 T.C. 556 (1950), affd., 190 F. 2d 84 (C.A. 4, 1951). In view of the circumstances surrounding the making of the Parking Lot Lease, it 328 is not necessary for us to choose between these conflicting authorities. If the parties to a lease are closely related and if the transaction has not been negotiated at arm's length, the courts have consistently held that payments in excess of reasonable rent are not "required to be made" and are therefore not deductible under section 162 (a)(3). Potter Electric Signal and Manufacturing Co. v. Commissioner, supra; Utter-McKinley Mortuaries v. Commissioner, supra; Coe Laboratories, Inc., supra; J. J. Kirk, Inc., supra; Jos. N. Neel Co., supra; Roland P. Place, supra; Stanwick's Inc., supra.The Graves were the sole stockholders of both Challenger and Sparks Development. Mr. Graves was the principal executive officer of both corporations and whatever *310 negotiations between such corporations took place were between Mr. Graves and himself. The evidence indicates that the amount of the rental provided in the Parking Lot Lease was not calculated to reflect the actual value of such lease, but rather, was established with the dual purpose of building up the capital of Sparks Development and providing it with sufficient funds to meet obligations it incurred in connection with the purchase of the Parking Lots. For these reasons, it is clear that the Parking Lot Lease was negotiated between closely related parties not dealing at arm's length. See Midland Ford Tractor Company v. Commissioner, 277 F. 2d 111 (C.A. 8, 1960), affg. a Memorandum Opinion of this Court, cert. denied 364 U.S. 881 (1960). Accordingly, if the socalled rental payments are excessive and unreasonable, the excess is not deductible under section 162(a)(3). Such amount is not deductible, irrespective of why it was paid ( Utter-McKinley Mortuaries v. Commissioner, supra), although the reasons for the payment of the excess are considered later in connection with the question of whether the Graves received any constructive dividends. *311 The question now becomes whether the rental provided by the Parking Lot Lease was reasonable. The evidence bearing on the reasonableness of the rentals charged Challenger under the Parking Lot Lease has come from three principal sources. Extensive data has been supplied by way of stipulation as to various real estate transactions occurring in the period 1954 through 1968. Additionally, the petitioners called as their witness Mr. Paul A. Walters, who operates a chain of commercial parking lots in Reno, Nevada. Finally, the respondent called as his witness Mr. Arthur W. Reber, a professional appraiser who prepared an appraisal of the fair rental value of the Parking Lots. Most of the argument has centered about the validity of this appraisal. Mr. Reber concluded that the fair rental value of the Parking Lots under the Parking Lot Lease was $36,681 a year, or 81 cents per square foot per year. He reached his conclusion by first determining the fair market value of the Parking Lots at the time of execution of the lease by an analysis of sales of real estate located in the vicinity of the Parking Lots occurring between 1955 and 1964. From this data he concluded that the fair market value *312 of the Parking Lots at the time of the lease was $282,163.00 or $6.24 per square foot. To determine the fair rate of return, he analyzed comparable leases of real property and found that the average rental provided in such leases was approximately 10 percent of the value of the leased premises. To this figure, he added 3 percent to cover the anticipated increase in the value of the Parking Lots over the term of the lease, so that in his opinion, 13 percent was a fair rate of return during the term of the lease. Although the respondent allowed an annual rental of $48,000.00, or $1.06 per square foot per year, he does not seek to increase the deficiency as a result of Mr. Reber's conclusion. The petitioners vigorously attack Mr. Reber's appraisal on numerous grounds: A. Qualifications of Mr. Reber The peitioners contend that the Reber appraisal is initially suspect and can in no event be accorded much weight, since Mr. Reber has no extensive experience in appraising Nevada gambling and parking properties. Mr. Reber is an experienced appraiser whose abilities have been noted by this Court in the past. Norman Baker Smith, 51 T.C. 429 (1968). He has appraised numerous *313 properties in the State of Nevada, including at least one gambling establishment. He has also appraised numerous commercial properties including parking lots. He testified that he was qualified to make an expert appraisal of the Parking Lots, and we believe him to be so qualified. However, the fact of his qualification does not prove the correctness of his appraisal, and we must now consider the petitioners' substantive objections to that appraisal. 329 B. Special Value of Parking Lots to Challenger The petitioners argue that the Reber appraisal gave no consideration to the unique value of the Parking Lots to Challenger. They contend that without ample free parking, the Sparks Nugget Casino could not have achieved its great success, and that accordingly, the Parking Lots were far more valuable than $282,163. In addition, they assert that by leasing the Parking Lots, Challenger foreclosed the possibility of the establishment of a competing casino on those premises. We recognize that free parking was a material factor in the casino's success; but it appears that the Reber appraisal has given this factor adequate consideration. Mr. Reber's appraisal took account of the purchase *314 of the Parking Lots by Mr. Graves during the period July 1958 through April 1959, for a total purchase price of $253,609.04. Yet, Mr. Reber appraised their value as of June 1959, just 2 months after the last acquisition, as $282,163.00, $28,553.96 more than was paid for them. It may be assumed that the sellers of the Parking Lots were aware, at least in general terms, of Mr. Graves' plans and bargained for all that they could get for their properties. In addition, Mr. Reber's analysis took into consideration the sales to Mr. Graves of other properties in the vicinity of the casino, and the prices of these properties must have reflected the bargaining of sellers who were attempting to secure from him the highest possible prices for their properties. Thus, Mr. Reber's determination of the fair market value of the Parking Lots was based upon the prices paid in the market place for properties used in connection with the casino's operations and therefore adequately reflects the value of the Parking Lots to Challenger. It also appears to us that Mr. Reber's valuation gives sufficient effect to the possibility of eliminating competition, since such valuation is based upon the market price *315 of properties in that vicinity at that time. In addition, we imagine that any number of lots in and around Sparks could have provided a site for competition, and it hardly seems practicable that the Graves could have eliminated all potential competition in the Sparks vicinity by acquiring or leasing all such lots. Furthermore, the petitioners have not shown that competition would reduce the profitability of the casino. The economic success of gambling establishments in such areas as Las Vegas and Reno may well be in substantial part due to the numerous casinos in those areas, which may serve to draw more people to each of them than would be drawn to a single casino in the same location. C. Validity of Comparable Sales The Reber appraisal states that it arrives at the fair market value of the Parking Lots by the market data or comparable sales approach. The petitioners note that certain of the comparable sales used by Mr. Reber were sales of the Parking Lots themselves to Mr. Graves. Accordingly, they argue that Mr. Reber's appraisal actually combines the comparable sale and the actual cost approach and that such a mixture renders his conclusions valueless. Whether or not Mr. *316 Reber technically adhered to the comparable sales approach, we perceive no reason, and none has been advanced, why the use of the actual cost of the Parking Lots diminishes the efficacy of the Reber appraisal. See International Paper Company v. United States, 227 F. 2d 201 (C.A. 8, 1955); United States v. 5139.5 Acres of Land, etc., 200 F. 2d 659 (C.A. 4, 1952); Ambassador Apartments, Inc., 50 T.C. 236 (1968), affd. per curiam 406 F. 2d 288 (C.A. 2, 1969). The Parking Lots were purchased in arm's length transactions within a year of the valuation date, and their cost supplies as good an index of their fair market value as the cost of similar lots. The petitioners also criticize Mr. Reber's technique, on the grounds that he did not "verify" the cost data relating to the post-1959 comparable sales. Mr. Reber obtained his data for such sales from the Nevada State Highway Department, who informed him that the sales had been verified by them. Apparently, it is the petitioners' position that data from a third party is inherently unreliable. However, it is well established that an appraiser may use hearsay information in formulating his *317 appraisal, if such information appears to be reliable. Standard Oil Company of California v. Moore, 251 F. 2d 188, 221 (C.A. 9, 1957), cert. denied 356 U.S. 975 (1958); District of Columbia Redevelopment Land Agency v. 61 Parcels of Land, 235 F. 2d 864 (C.A.D.C. 1956); International Paper Company v. United States, supra; United States v. 5139.5 Acres of Land, etc., supra.In this case, we see no basis to question the reliability of the information obtained from the State. The petitioners contend that the Reber appraisal is also deficient inasmuch as it does not consider all the comparable sales 330 occurring in the vicinity of the Parking Lots. They refer to four sales which they contend were not considered by Mr. Reber. Of those four sales, one occurred in 1957, one occurred in 1958, and two occurred in 1960. The 1957 and 1958 sales were for prices substantially lower than the average prices for comparable sales in those years found by Mr. Reber, and the petitioners have not demonstrated that the omission has prejudiced them in any way. Mr. Reber did not detail the post-1959 comparable sales that he considered *318 in valuing the Parking Lots since such data is not as relevant to determining market value in 1959 as pre-1960 sales. Accordingly, we cannot be certain whether or not Mr. Reber did in fact consider that 1960 sales mentioned by the petitioners. One of such sales was for a price substantially lower than the average post-1959 sales prices considered by Mr. Reber, and the other sale was for a substantially higher price. However, the petitioners have not indicated whether or not the higher-priced sale was of improved realty - if it was, such fact might account for the higher price. In any event. only one of the sales allegedly not considered by Mr. Reber might be helpful to the petitioners, and its omission does not make any significant difference in the result. The petitioners object to the selection of most of the comparable sales used by Mr. Reber, since such sales were of property used at the times of sales for residential purposes. From this fact, the petitioners conclude that the purchase prices of the comparables were based on their use as personal residences, and that they are not comparable to property the purchase price of which is based on its commercial use. We do not agree. *319 The evidence indicates that all of the comparable sales used by Mr. Reber were of property zoned and appropriate for commercial use. Furthermore, it is evident that almost all of the purchasers intended to use the properties purchased by them for commercial purposes. There is no indication in the record that the sellers of the comparables sold them with the understanding that they would be used as residential property. In negotiating the purchase price, the sellers would naturally base their sales price on the market value of their property, taking into consideration their potential use as commercial property. D. Correctness of Rate of Return The petitioners assert that Mr. Reber's use of a 13-percent rate of return is entirely insufficient to reflect the earning power of the Parking Lots, that he failed to take into consideration that the lease was to run for a 5-year period, and that his allowance of 3 percent for an increase in the value of the property was unrealistic. In support of these contentions, they point out that Mr. Reber's computations indicate increases in land value over the 5-year period from 1959 through 1964 of 27 percent. [3]
*320 The parties to the leases which Mr. Reber used as his comparables, no doubt, took into consideration the likelihood of inflation and increase in the value of the property in fixing the rate of rentals in such leases, and therefore, the average rate of return of approximately 10 percent found by Mr. Reber gave some effect to the expected increase in the value of the Parking Lots. Nevertheless, Mr. Reber added 3 percent to the average in order to give ample effect to the term of the lease and the likely increase in the value of the properties during such term. This addition was more than adequate to cover the actual increase in the value of the properties. It constituted a 30-percent addition to the annual return on the value of the Parking Lots under the lease; whereas, Mr. Reber's study shows that the property only increased 27 percent in value over the 5 years of the lease, or approximately 5 percent per year. Mr. Reber's objective was to examine the circumstances existing in 1959, and based upon such circumstances, to project the reasonable rental to be expected over the 5-year period of the lease. Midland Ford Tractor Company v. Commissioner, supra; Brown Printing Co. v. Commissioner, supra; *321 J. J. Kirk, supra; Stanley Imerman 7 T.C. 1030 (1946). Although the casino turned out to be a very successful operation, his addition of more than 30 percent to each year's income to take into consideration the likely changes over the term of the lease were generous in the light of what could have been anticipated in 1959. Although all but one of the 12 comparable leases considered by Mr. Reber involved gambling-associated property, the petitioners argue that there are sufficient differences between the comparables and the Parking Lot Lease to render Mr. 331 Reber's appraisal valueless. The petitioners note that certain of the comparables involved more speculative operations than the Parking Lot Lease. However, if such leases were more speculative, it seems that the rate of return on them should have been higher than on the Parking Lot Lease, and therefore, their use could not prejudice the petitioners. Some of the leases involved property of less value than the Parking Lots; but this difference does not affect the usefulness of such leases - the lesser value reduces the gross rental, but does not affect the rate of return. Other comparable leases are *322 criticized by the petitioners because they involved property not in Sparks, Nevada. However, since all but one of the comparable leases considered by Mr. Reber involved property used in connection with gambling establishments, we see no reason to reject data from leases on property in different geographic areas, especially since there were few leases of gambling property in Sparks. The petitioners criticize the remaining comparables on the alternative grounds that they were entered into as much as 7 years before the Parking Lot Lease, or were leases of improved realty. The petitioners have suggested no reason why these facts should materially affect the reliability of Mr. Reber's appraisal and we perceive none. The petitioners object to Mr. Reber's omission of the sublease between Challenger and Nugget Enterprises of the Sparks Nugget Casino. This lease was found to be reasonable in The Challenger, Inc., 23 T.C.M. 2096, 33 P.-H. Memo. T.C. par. 64,338 (1964). We think Mr. Reber was justified in disregarding this lease since the parties thereto were closely related and did not negotiate it at arm's length. In addition, our prior holding was only that the rentals under *323 the lease were reasonable. We expressed no opinion as to the fair rental value of the property which was the object of Mr. Reber's inquiry. Finally, the 80 cents per square foot per year rental under such lease was less than the amount found by Mr. Reber, and considerably less than the amount allowed by the respondent in this case, and consequently, the petitioners are not prejudiced by Mr. Reber's omission of the information concerning the lease approved in the earlier Challenger case. The petitioners point out that Mr. Reber was not conversant with all the terms of either the Parking Lot Lease or the leases which he considered comparable. His testimony indicates that he was aware that the Parking Lot Lease was for a term of 5 years and was renewable, but that he was unaware of the provision in the lease allowing the lessee to terminate in the event gambling was outlawed in Nevada. The fact that Mr. Reber was unaware of the termination provision does not, we think, diminish the viability of his appraisal. His appraisal report sets forth the term and the rental of each of the comparable leases he employed. Such data is by far the most significant information he required in making *324 his appraisal. We cannot expect appraisers appearing before this Court to be familiar with all the provisions of the legal documents relating to comparable property selected by them in their appraisals. It appears that Mr. Reber obtained his information on all but two of the comparable leases by talking to persons associated with either the lessor or the lessee. With respect to the other leases, Mr. Reber was unclear as to his source of information, but such information appears to have come to him in his professional capacity during the course of his appraisal. The petitioners contend that such information is inherently unreliable and that Mr. Reber should have consulted the provisions of the leases themselves. As we have noted previously, the appraiser may rely upon hearsay data in formulating his appraisal. In the present case, we do not think that such reliance is untoward or significantly affected the accuracy of the appraisal. In summary, the petitioners' objections to the Reber appraisal are not well taken. His determination of the fair market value of the Parking Lots at the time of the lease is adequately supported by market data, and his use of 13 percent as the rate of *325 return seems to be appropriate. Accordingly, his conclusion as to the fair rental value of the Parking Lots for the term of Parking Lot Lease is valid. The petitioners contend that the data relating to most of the other real estate transactions in Sparks included in our Findings of Fact is not relevant, because such transactions are not comparable to the lease of the Parking Lots. They emphasize that the Parking Lots furnished the most convenient parking for the casino and therefore could command much higher rentals than the other properties leased in Sparks. They also contend that most of the other transactions described in our findings are not pertinent to our inquiry because they involved 332 property which was either improved, leased prior to the opening of the new casino, acquired for employee parking, or acquired for access. Rather, the petitioners take the position that the most significant transactions were the acceptance of the rental provisions of the Parking Lot Lease by Mr. Ascuaga when Sparks Nugget, Inc., acquired Challenger; the renewal of such lease at the same rental in 1964; and the supplemental lease entered into between Sparks Development and Sparks Nugget, *326 Inc., on August 1, 1962. In our opinion, none of these transactions constitute a showing of substantial error in the Reber appraisal. Sparks Nugget, Inc., controlled by the Ascuagas, acquired the stock of Challenger, controlled by the Graves, on September 30, 1960. Although Mr. Ascuaga was a former employee of Mr. Graves, the evidence indicates that the transaction was one at arm's length. The petitioners point out that, as a condition to the stock purchase, Mr. Ascuaga insisted on the extension of the period for which the Parking Lot Lease could be renewed; from that fact, the petitioners would have us infer that the provisions of the lease were open for renegotiation and that by not renegotiating the rental, Mr. Ascuaga was acknowledging its reasonableness. We do not think such an inference is warranted. In purchasing Challenger's stock, Sparks Nugget, Inc., in effect, acquired the entire properties and liabilities of Challenger for a total unallocated consideration. In such a situation, the purchase price may be allocated among the various items of property owned by the acquired corporation in any manner desired by the parties. For example, if Sparks Nugget, Inc., felt that the *327 rental under the Parking Lot Lease was unduly high, a readjustment of the rent would not be necessary if there was a downward adjustment in the purchase price of the stock. The fact that the period of the lease was renegotiated is not persuasive to us. Although excessive rentals under the lease could be compensated by an adjustment in the purchase price of the Challenger stock, no such adjustment was possible with respect to the length of the lease. The Parking Lots were important to the casino's success, and the only way Sparks Nugget, Inc., could assure itself of their continued availability was by securing a modification of the lease. An adjustment in the purchase price of the stock could not take the place of lengthening the lease. Equally unpersuasive is the fact that Sparks Nugget, Inc., renewed the Parking Lot Lease in 1964 at the same rental of $8,000 per month. Although Mr. Reber did not appraise the Parking Lots as of the renewal date, his records do show that the average sales price of comparable pieces of property increased from $5.99 per square foot in 1959 to $7.57 per square foot in 1964, an increase of 27 percent. If the Parking Lots increased in value by this same *328 percentage, the annual rental of $2.12 per square foot for the renewal term is only a 27-percent annual rate of return based on the 1964 value of the Parking Lots as opposed to a 34-percent rate of return based on the 1959 value. Thus, although the lease was renewed at the same rental, the rate of return was actually reduced, despite the fact that between 1959 and 1964, the casino operation expanded considerably, resulting in a greater need for parking and a diminution of available parking space. What is more, although we have found that Sparks Development and Sparks Nugget, Inc., dealt at arm's length, we do not necessarily find that each individual transaction between them was for a consideration representing fair market value. Sparks Nugget, Inc., was, to a certain extent, dependent for its success on the good will of Sparks Development and its owners, the Graves. During 1964, Sparks Development and the trusts established by the Graves were leasing the casino premises and at least two additional parking lots to Sparks Nugget, Inc. Additionally, payments for the Challenger stock were still being made to the Graves by Sparks Nugget, Inc., pursuant to the purchase agreement; accordingly, *329 Sparks Nugget, Inc., could not make capital expenditures in excess of $10,000 per year without the Graves' approval. Furthermore, Mr. Graves was the controlling stockholder of Nugget Motor Lodge, Inc., which owned and operated a motel supplying considerable business to the casino. Finally, the Graves owned a small amount of the stock of Sparks Nugget, Inc. These various associations between lessor and lessee diminish the reliability of the rental paid for the renewal term of the Parking Lot Lease as an index of fair rental value of the Parking Lots. The petitioners contend that the terms of the supplemental lease also call into question the conclusions of the Reber appraisal. They point out that although this lease involved property not as valuable to the casino operation as the Parking Lots, the 333 rental was $1.68 per square foot - only 44 cents per square foot less than the rental of the Parking Lots under the Parking Lot Lease, 87 cents per square foot more than the Reber appraisal of the fair rental value of the Parking Lots, and 62 cents per square foot more than the reasonable rental allowed by the respondent. Since the properties subject to the supplemental lease (Lots *330 1 and 2 in Block 1, Lot 4 in Block 4, and Lots 22, 23, and 24 in Block 5) were further from the casino than the Parking Lots, we agree with the petitioners' contention that they were not as valuable for parking purposes as the Parking Lots. However, Mr. Reber determined the fair rental value of the Parking Lots as of June 17, 1959, based upon the facts existing at that time and those reasonably foreseeable. By 1962, when the supplemental lease was made, there had been a spectacular expansion in the casino operations, a reduction in the available parking, and a vastly increased need for parking spaces. These circumstances indicate a demand for parking that was not foreseeable as of 1959 and explain why there may have been an increase in the value of properties in the vicinity of the casino that was not reasonably foreseeable as of 1959. The most useful comparison, we think, can be drawn with respect to Lots 1-8 in Block 3, which have been used for both parking and as the casino premises. The Trustee owned these premises and initially leased them to Challenger on May 1, 1957, for parking, before the new casino was built. The rental established under this lease was not to exceed 59 *331 cents per square foot. Subsequently, on September 23, 1957, the lease with Challenger was cancelled and the Trustee leased the premises to Nugget Enterprises for 80 cents per square foot. The lease has a 20-year term and a 10-year renewal option and provides that the rent be renegotiated every 5 years. Nugget Enterprises constructed the casino on a part of the premises and subleased it to Challenger. On January 1, 1962, the lease between the Trustee and Nugget Enterprises was amended to provide a rental of $1.27 per square foot. If the 1957 rental and the 1962 rental under this lease represent the fair rental value of the casino property on those dates and if the fair rental value increased ratably over that period, the fair rental value of the property on June 17, 1959, was approximately 99 cents per square foot. This figure is 18 cents higher than the fair rental value of the Parking Lots found by Mr. Reber and 7 cents lower than the rental allowed by the respondent in his determination. These premises, as we have noted, were used for parking and as the site of the casino. There is every reason to believe that they were at least as valuable as the Parking Lots and had as high a rental *332 value per square foot as the Parking Lots. In addition, the lessor of the premises was the trustee of trusts for the Graves' children. It was therefore under a fiduciary duty of care not to lease the premises for an unfairly low rent. The petitioners have attempted to support the reasonableness of the rental under the Parking Lot Lease by the testimony of Paul A. Walters, an operator of commercial parking lots in Reno. Mr. Walters testified that the charge for parking space in Reno was 50 cents for 4 hours. He felt that the casino could charge 50 cents for 3 hours parking since the Parking Lots were very convenient to the casino. He also believed that each parking space in the Parking Lots would turn over four to five times daily. He concluded that each space would return $2.25 to $2.50 per day or about $75 per month. The petitioners point out that the Parking Lots contained 143 parking spaces, which, at $75 per month, would yield more per month than the rental paid in respect of such spaces under the Parking Lot Lease. We do not find this testimony persuasive. Mr. Walters' estimates were based upon the gross receipts to be derived from the parking spaces and did not take into consideration *333 any expenses for overhead, personnel, taxes, etc. Furthermore, he was comparing the fees that could be charged for parking in an area which included a variety of businesses. We are not convinced that the patrons of the casino would have paid comparable fees for parking. The uses of the parking spaces which Mr. Walters had in mind are too different from the uses of the parking spaces near the casino to make comparisons reliable. The petitioners have sought to convince us of the reasonableness of the rentals provided under the Parking Lot Lease. Nothing in the evidence supports their position. The rental of $2.49 per square foot for the first year of the lease term is a 45-percent annual rate of return on Mr. Graves' cost of acquiring the Parking Lots; the rental of $2.12 per square foot for the last 4 years of the initial lease term is a 38-percent annual return on cost. The evidence clearly indicates that the value of the Parking Lots at the time the lease was executed was not substantially greater than the cost to Mr. 334 Graves. It is equally apparent that Sparks Development incurred little risk and less expense in leasing the Parking Lots. In light of these facts, the record *334 clearly indicates that a rental which allows total cost recovery in less than 3 years is wholly excessive. After considering all these facts and arguments, we have concluded that the reasonable rental of the Parking Lots during the term of the Parking Lot Lease did not exceed $4,000 per month, or $1.06 per square foot per year, the amount allowed by the respondent in his determination. Mr. Reber's determination that the fair rental value was 81 cents per square foot per year appears to be reliable. It represents a return of 13 percent on the fair market value of the property. The respondent's allowance represents a return of 17 percent on the fair market value of the Parking Lots. Although we have carefully analyzed each step of Mr. Reber's analysis and carefully considered the other evidence offered by the petitioners, there is nothing to convince us that his conclusions are significantly in error; there is nothing to lead us to believe that his allowances should be increased by enough to offset the additional allowance already approved by the respondent. Accordingly, we hold that the amounts paid under the Parking Lot Lease, to the extent that they exceed $4,000 per month, were *335 not required to be paid under such lease and are not deductible under section 162. II. Constructive Dividends to the Graves The respondent has determined that Challenger could not deduct in full the amounts paid by it with respect to the Parking Lot Lease and its lease of 100 slot machines. He further determined that the amounts so disallowed constitute a constructive dividend to the Graves as shareholders of Challenger, since the money was paid for their benefit by one corporation owned by them to other corporations owned by them. Although Sparks Nugget, Inc., transferee of Challenger, has contested the correctness of the disallowance of rental deductions with respect to the Parking Lots, it has conceded the correctness of the respondent's determination disallowing Challenger rental deductions for payments made to Pub, Waldorf, and Saratoga with respect to the slot machines. However, the Graves, for purposes of determining the amount of any constructive dividends to them, do dispute the question of whether any amounts paid in respect of the slot machines may be disallowed to Challenger as rental deductions. In its taxable year ending September 30, 1959, Challenger paid Pub, *336 Waldorf, and Saratoga a total of $97,336.07; in its taxable year ending September 30, 1960, Challenger paid such corporations a total of $103,821.15. Challenger claimed these amounts as rental expense for the 100 slot machines leased from such corporations. Computed on a monthly basis, these figures result in a monthly rental of $81.11 per machine in Challenger's 1959 taxable year, and $86.52 in its 1960 taxable year. In The Challenger, Inc., 23 T.C.M. 2096, 33 P.-H. Memo. T.C. par. 64,338 (1964), involving Challenger's taxable years 1955 through 1958, this Court found that the reasonable monthly rental for the slot machines did not exceed $2.59 per machine. The respondent contends that the doctrine of collateral estoppel operates to bar us from again examining the reasonable rental of the slot machines and that for purposes of the Graves' tax liability, we must consider all amounts paid in respect of the slot machines which exceed $2.59 per month per machine as unreasonable and nondeductible by Challenger under section 162(a)(3). The petitioners repeat their argument that section 162(a)(3) puts no limit on the amount deductible as rental deductions for payments made *337 pursuant to an enforceable leasing agreement. They next argue that even if such a limit does exist, the conclusion reached with respect to reasonable rental in the Challenger case was erroneous and that they are not collaterally estopped to show as much. Finally, they argue that even if excessive amounts were paid by Challenger to Sparks Development for the Parking Lots, and to Pub, Waldorf, and Saratoga for the slot machines, such amounts do not constitute constructive dividends to the Graves. We cannot agree with any of these contentions. We have already held that section 162 (a)(3) does not operate to bar inquiry into the reasonableness of amounts claimed as rental deductions, at least when the lessor and lessee are closely related parties not dealing at arm's length. We must next consider whether the amounts claimed as rental deductions under the slot machine lease were reasonable. 335 The petitioners argue that collateral estoppel cannot be applied in this proceeding, since the parties against whom it is sought to be invoked were not parties in the earlier Challenger case, and since there has been an intervening change in applicable legal principles. It is true that *338 the Graves were not technically parties in the prior proceeding. However, collateral estoppel may be applicable when the later case involves the same parties as in the earlier proceeding, or when it involves parties who were in privity with the parties in the earlier proceeding. Sunshine Coal Co. v. Adkins, 310 U.S. 381 (1940). Stockholders are considered to be in privity with their corporation, and, if the other requirements of collateral estoppel are present, they cannot relitigate determinations rendered in a proceeding involving the corporation. D. Bruce Forrester, 4 T.C. 907 (1945); Jahncke Service, Inc., 20 B.T.A. 837 (1930), appeal dismissed per curiam 112 F. 2d 169 (C.A. 5, 1933). See also Seaboard Commercial Corporation, 28 T.C. 1034 (1957); American Range Lines, Inc., 17 T.C. 764 (1951), affd. on this issue 200 F. 2d 844 (C.A. 2, 1952). Moreover, it seems manifestly reasonable to apply the doctrine in the present case. The Graves were the sole shareholders of Challenger, Pub, Waldorf, and Saratoga at the time of the previous proceeding. The petitioners in that proceeding vigorously *339 defended the propriety of the rental deductions claimed by Challenger in respect of its leasing of the slot machines. It is plain that the Graves were as much concerned with the outcome of the prior proceeding as if they had been parties thereto, and we see no reason to allow them to relitigate questions previously decided merely because they were not technically parties in the Challenger case. We also see no merit in the petitioners' contention that there has been a substantial modification in the law since the decision in the Challenger case. Commissioner v. Sunnen (1948). As support for this position, the petitioners point to the cases of Royal Farms Dairy Co., 40 T.C. 172 (1963), and Estate of Sol Goldenberg., 23 T.C.M. 810, 33 P.-H. Memo T.C. par. 64,134 (1964). In each of these cases, we disallowed a portion of a rental deduction on the ground that the amount treated as rent was unreasonable and was not required to be paid within the meaning of section 162(a)(3). Both cases were appealed by both the respondent and the petitioners to the Court of Appeals for the Ninth Circuit; but the appeals were dismissed by the court pursuant to the following stipulations *340 of the parties: It is hereby stipulated by and between the parties hereto, through their Counsel, that the Commissioner of Internal Revenue dismiss his petition for review of the above decision and that the taxpayer dismiss its petition for review of the above decision, with no cost to either party, and that the case be remanded to the Tax Court with directions to enter a revised decision providing for a recomputation of deficiencies to permit the taxpayer deductions for the payments it claimed as "rent" in the above case. The petitioners argue that this concession by the respondent constitutes an acknowledgement by him that amounts paid as rent are deductible without regard to their reasonableness. However, we think that no such interpretation of the respondent's action is warranted. In the first place, he merely conceded the deductibility of the rental payments involved in those cases, and that concession may have been due to a recognition that he could not successfully establish that the rental payments were unreasonable. Furthermore, those cases involved a different principle of law, because in them the lessor and lessee were unrelated parties; whereas, in both the earlier *341 Challenger case and in this case, the lessor and the lessee were related parties not dealing at arm's length. We hold that the doctrine of collateral estoppel bars the petitioners from relitigating the question of the reasonable rental of the slot machines. [4]
*342 Having found that Challenger paid excessive rentals under the Parking Lot Lease and for use of the slot machines, we reach the question of whether such excessive amounts constitute constructive dividends to the Graves. According to the respondent, Challenger served no corporate purpose of its own by paying excessive rentals to Sparks Development, Pub, Waldorf, and Saratoga. Challenger made such payments only because the Graves owned and controlled it and the other corporations. The Graves arranged to have Challenger make the excessive payments for their benefit. In effect, the Graves were thereby transferring funds from one corporation owned by them to other corporations owned by them. It was as if Challenger had distributed the excessive amounts to the Graves, and they in turn contributed them to the other corporations. Section 316 defines a dividend as a distribution of property by a corporation to its shareholders out of earnings and profits. For tax purposes, a dividend need not be formally declared as such by the corporation. Barbourville Brick Co., 37 T.C. 7 (1961). Nor is it necessary that the distribution be made directly by the corporation to its shareholders. *343 A distribution by a corporation to a third party for the benefit of a shareholder constitutes a constructive dividend, which will be taxed as a dividend to the shareholder for whose benefit the distribution is made. Worcester v. Commissioner, 370 F. 2d 713 (C.A. 1, 1966), affg. in part a Memorandum Opinion of this Court., Equitable Publishing Company v. Commissioner, 356 F. 2d 514 (C.A. 3, 1966), affg. per curiam a Memorandum Opinion of this Court, cert. denied 385 U.S. 822 (1966); Biltmore Homes, Inc. v. Commissioner, 288 F. 2d 336 (C.A. 4, 1961), affg. a Memorandum Opinion of this Court cert. denied 368 U.S. 825 (1961); Helvering v. Gordon, 87 F. 2d 663 (C.A. 8, 1937), revg. 29 B.T.A. 275 (1933); L.L. Silverstein, 36 T.C. 438 (1961); Limericks, Inc., 7 T.C. 1129 (1946), affd. 165 F. 2d 483 (C.A. 5, 1948). The benefit conferred by such a distribution need not be of a direct financial nature. It may be merely the pursuit of a hobby, the fulfillment of a moral obligation, or the making of a gift. W. D. Gale, Inc. v. Commissioner 297 F. 2d 270 *344 (C.A. 6, 1961), affg. a Memorandum Opinion of this Court Byers v. Commissioner, 199 F. 2d 273 (C.A. 8, 1952), affg. a Memorandum Opinion of this Court, cert. denied 345 U.S. 907 (1953); Commissioner v. Greenspun, 156 F. 2d 917 (C.A. 5, 1946), revg. in part a Memorandum Opinion of this Court; Montgomery Engineering Company v. United States, 230 F. Supp. 838 (D. N.J. 1964), affd. per curiam 344 F. 2d 996 (C.A. 3, 1965); Stanwick's, Inc., supra.The essence of a constructive dividend is a distribution of corporate earnings for the private purposes of a shareholder. Cf. Helvering v. Horst, 311 U.S. 112 (1940). The petitioners argue that no tax or other benefit accrued to the Graves by virtue of any excessive rentals paid by Challenger to Sparks Development, Pub, Waldorf, and Saratoga. The Graves wholly owned all of the corporations, and all of them were in the highest corporate tax bracket. In their view, any unjustified transfer of funds had no greater effect than the transfer of funds by an individual from one bank account to another. We cannot agree with this contention since the Graves secured *345 substantial benefits by virtue of the arrangement. Although Mr. Graves was aware that the excessive rentals would not have any corporate tax effect, he believed the amount of the rentals could reduce his personal income taxes. We do not know what benefit he had in mind, but from an examination of the objective facts, we can see the benefits which he derived from the arrangements. He operated his business through many corporations. The casino business itself was owned by one corporation, Challenger; the building and land on which it was built were owned by another organization, the joint venture; the slot machines were owned by other corporations; and the Parking Lots by still another corporation. Mr. Graves testified that he always had in mind retiring early, and this division of his business into several organizations facilitated the sale of the casino business, leaving him with investment properties from which he could derive income with a minimum of active management on his part. When he transferred funds from one corporation to another, the transfer had a good deal more significance than a transfer from one bank account to another. Because Challenger paid excessive rentals for *346 337 the use of the slot machines to Pub, Waldorf, and Saratoga, those corporations had available funds to be used in the construction of the casino building that would otherwise have had to be obtained in some other manner. For example, without such excessive rentals, it might have been necessary for Mr. Graves to make capital contributions to such corporations out of his income on which he paid taxes. Similarly, when he established the rental to be paid to Sparks Development for the use of the Parking Lots, it was set high enough to provide the funds necessary to pay off the obligations incurred in the purchase of the Parking Lots. Had the rentals been set at a lower figure - at the amount which would have been paid in the market place for the rental of such Parking Lots, it would have been necessary for Sparks Development to have secured additional capital in some other manner, for example, by contributions from Mr. Graves. In other words, as a result of the payment of excessive rentals, the equity in Sparks Development, Pub, Waldorf, and Saratoga was increased, and when the Challenger stock was sold to the Ascuagas, the Graves were left with valuable corporations, Sparks Development, *347 Pub, Waldorf, and Saratoga. The petitioners contend that the excessive rentals amounted to nothing more than capital contributions by Challenger to its sister corporations. See sec. 362(c). In support of this contention, they have cited cases holding that payments by nonstockholders to a corporation may constitute capital contributions. Brown Shoe Co. v. Commissioner 339 U.S. 583 (1950); Edwards v. Cuba Railroad, 268 U.S. 628 (1925); Federated Department Stores, Inc., 51 T.C. 500 (1968); Sherwood Memorial Gardens, Inc., 42 T.C. 211 (1964); Foresun, Inc., 41 T.C. 706 (1964), affd. in part 348 F. 2d 1006 (C.A. 6, 1965); Veterans Foundation 38 T.C. 66 (1962), affd. 317 F. 2d 456 (C.A. 10, 1963). Although we agree that capital contributions do not constitute taxable income, it is still necessary to examine the surrounding circumstances to determine whether funds were transferred for the purpose of making a capital contribution, and the circumstances of this case do not indicate that the excessive rentals were paid for such a purpose. When a person who is not a shareholder makes a *348 contribution to the capital of a corporation, he does so because he expects to benefit materially or otherwise from the corporation having the additional capital. Challenger could expect no benefit to itself from the payment of the excessive rentals. Indeed, it could have purchased the slot machines with the amounts it paid each year for the rentals, and Challenger derived no benefit from the fact that its excessive rentals enabled Sparks Development to pay off quickly the loans incurred in purchasing the Parking Lots. It seems altogether clear that if Challenger had been independent from control by the Graves, it would have had no reason to make capital contributions to those corporations which received the excessive rentals. They were paid because Mr. Graves willed it so, not because Challenger benefited thereby. The petitioners contend that Challenger was under a legal obligation to pay the full amount required as rent under the Parking Lot Lease and the slot machine lease. We need not pass on the effect of local law. The provisions of the Internal Revenue Code take precedence over local law in determining the tax consequences of a transaction. For Federal tax purposes, the amounts *349 claimed by Challenger as rental deductions were not required to be paid as rent, irrespective of whether the leases were enforceable under local law. Even if the sums were required to be paid under local law, such fact does not relieve the Graves of dividend liability when the sums so paid were in substance a distribution of corporate earnings. Finally, the petitioners argue that there is no justification in taxing the excessive rental payments as dividends since such payments remained in corporate solution after the payments were made, and since they would be taxable when eventually distributed to the Graves. In effect, it is argued that funds may be transferred from one corporation to another without tax consequences since nothing has actually been distributed to the shareholders. However, this argument overlooks the fact that each corporation is considered a separate legal person for tax purposes, and in the absence of some specific statutory or other exception, a transfer of funds from one corporation to another has immediate tax consequences. If one corporation sells goods or furnishes services to another corporation, such transactions must be recognized and given effect in *350 determining the taxation of the corporations. Likewise, when, as in this case, there is a transfer of funds between corporations, the transfer must have some effect upon the 338 capital or earnings and profits of the corporations. The effect of such transfer cannot be ignored. We have found that, in this case, the transfer was for the benefit of the Graves. It was in effect a contribution to capital by them, and that fact will influence the tax treatment of the corporations which received the transfer. Finally, it does not follow, as claimed by the petitioners, that the excessive rentals will eventually be taxed to the Graves when distributed by Sparks Development, Pub, Waldorf, and Saratoga. There is no certainty that such payments will ever be distributed to the Graves, and the taxation of any distributions to the Graves will depend upon other circumstances existing at the time of such distribution. III. Payments by Sparks Development to Mr. Graves The final issue for our consideration is whether $8,539.01 paid by Sparks Development to Mr. Graves in its taxable year ending November 30, 1961, is deductible under section 162(a). That provision states in part: There shall *351 be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; Mr. Graves testified at the trial of this proceeding as to the services he rendered Sparks Development from the time of its formation. Through his efforts, Sparks Development acquired and leased various parcels of realty. It is obvious that most of these activities occurred in years other than Sparks Development's taxable year 1961. There is no evidence before us of any activity by Sparks Development during such year other than its collection of payments made by Challenger pursuant to the Parking Lot Lease and its payment on account of indebtedness incurred when it purchased the Parking Lots. However, the record does indicate that Mr. Graves engaged in protracted negotiations for a parcel of property acquired by Sparks Development on October 29, 1962, and we have inferred that some of such negotiations did occur in 1961. Furthermore, since Mr. Graves was compensated under an arrangement by which he received a percentage of *352 the earnings of Sparks Development, it is clear that the adequacy of his compensation must be judged over a period of years. See California Vegetable Concentrates, Inc., 10 T.C. 1158 (1948). Although he performed few services for Sparks Development in 1961, he apparently performed extensive services for the corporation in other years. Obviously, Mr. Graves is a highly qualified businessman, and his services are very valuable. In view of the nature of the arrangement for his compensation, and the extensive and valuable services performed by him over the years for Sparks Development, we have found that the compensation paid him during that year was not excessive, and we hold that the entire amount, $8,539.01, is deductible. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Sparks Development Co., Docket No. 4277-67; Flora J. Graves, Docket No. 4278-67; R.L. Graves and Flora J. Graves, Docket No. 4279-67; and R.L. Graves, Docket No. 4280-67.↩
2. All statutory references are to the Internal Revenue Code of 1954.↩
3. The petitioners' brief states that the land value increase was "at least 20 percent." Actually, such increase was 27 percent, and we have used the latter figure in our discussion.↩
4. The earlier Challenger case involved Challenger's taxable years 1955 through 1958, and the present case involves the reasonableness of the rental of the slot machines for its taxable years 1959 and 1960. Obviously, the issue of fact in this proceeding is not identical to the issue previously determined - the reasonable rental of the slot machines is not a static fact but is rather a recurring one which may change from year to year. However, this difference does not provide a basis for not applying collateral estoppel. In the first place, the petitioners have not raised the issue. In the second place, they have introduced no evidence in this proceeding tending to prove that a material change of facts occurred between the years involved in the Challenger case and those involved in this proceeding - they merely offered and criticized the Court's conclusion with respect to the earlier years. See Estate of William G. Maguire 50 T.C. 130↩ (1968).